### KAISER–FRAZER CORP. v. OTIS & CO.
#### No. 152, Docket 22113.

United States Court of Appeals
Second Circuit.

Argued Jan. 14, 1952.

Decided April 7, 1952.

Ben Herzberg, New York City, and Arnold, Fortas & Porter, Washington, D. C., (Abe Fortas, Washington, D. C., Ben Herzberg, New York City, Milton V. Freeman, Washington, D. C., and Lawrence R. Eno, New York City, of counsel), for Otis & Co., appellant.

Willkie, Owen, Farr, Gallagher & Walton, New York City, (Mark F. Hughes, Walston S. Brown, Helmer R. Johnson, Vincent R. Fitzpatrick and Richard Owen, all of New York City, of counsel), for Kaiser-Frazer Corp., appellee.

Before AUGUSTUS N. HAND and CLARK, Circuit Judges, and BRENNAN, District Judge.

AUGUSTUS N. HAND, Circuit Judge.

On February 3, 1948, the plaintiff, Kaiser-Frazer Corporation, an automobile manufacturer, entered into a contract for the sale of 900,000 shares of its unissued common stock at $11.50 per share to Otis & Co., First California Company, and Allen & Co., securities underwriters, who in turn were to offer the stock for sale to the public at $13. per share. The purchasers were to take title to the stock severally, Otis and First California having agreed to purchase 337,500 shares each, and Allen & Co. to purchase the remaining 225,000 shares. The contract made the purchasers' obligation to accept the stock subject to certain conditions which, so far as relevant here, may be summarized as follows: (1) Kaiser-Frazer's counsel was to deliver an opinion satisfactory to the purchasers' counsel that there were no material legal proceedings pending against the issuer; and (2) the registration statement (including the prospectus filed with the Securities & Exchange Commission pursuant to the Securities Act of 1933, 15 U.S.C.A. § 77a et seq.,) was to comply with the Act and the Regulations of the SEC " * * * and

neither the Registration Statement nor the Prospectus [were to] contain any untrue statement of a material fact nor omit to state any material fact required to be stated therein or necessary in order to make the statements therein not misleading * * * " It is undisputed that the registration statement (including the prospectus) was filed with the SEC and became effective on February 3, 1948, the day the contract was signed. The contract set February 9, 1948 as the closing date, at which time Kaiser-Frazer was to have delivered the stock to the purchasers, and the latter were to have paid the purchase price. On the day of the closing, however, the representatives of Otis and First California refused to accept the proffered stock, assigning as their reason therefor, the rejection of the opinion of Kaiser-Frazer's counsel that no material litigation was then pending which would affect the issue of the stock. Apparently, Otis and First California rejected the opinion of Kaiser-Frazer's counsel because a suit to enjoin the pending stock issue had been instituted in Michigan on the morning of February 9, 1948, by a Kaiser-Frazer stockholder named Masterson.[1] Shortly thereafter, Kaiser-Frazer initiated the present action against Otis in the District Court for the Southern District of New York. Federal jurisdiction was invoked on the ground of diverse citizenship of the parties.[2] The complaint—which was amended—alleged three claims, the first of which charged that Otis was guilty of a breach of contract for failing to accept and pay for 337,500 shares of stock and asked for damages in the total amount of $17,419,819, composed of $1,856,250 general damages and $15,-563,569 special damages arising out of manufacturing profits lost by Kaiser-Frazer on account of Otis' breach. The second claim was stated as an alternative to the first and alleged that Otis had inspired the institution of the stockholders' suit by Masterson and had repudiated the contract without excuse; the damages prayed for were the same as under the first claim.

1. The representative of Allen & Co. at the closing expressed a willingness to perform despite the action of Otis and First California.

2. Kaiser-Frazer is a Nevada corporation and Otis is a Delaware corporation qualified to do business in New York.

The third claim was that Otis had wrongfully induced First California not to perform the latter's obligation under the contract to purchase 337,500 shares of stock and asked for damages in the amount of $1,856,250.

The defendant's answer to the complaint set forth several affirmative defenses, only two of which are in issue on this appeal: The first, that the purchasers were relieved of any obligation under the contract because of the filing of the suit by Masterson, and the second, that the registration statement contained false and misleading statements. After an extensive trial lasting six weeks, the district judge made findings of fact in favor of the plaintiff on substantially all of the points in issue, and entered judgment for the plaintiff in the amount of $3,120,743.51.

Several errors are assigned by the defendant on this appeal, most of which deal with the findings of fact of the trial judge. However, because of the view we take of the case, we need discuss only one of the alleged errors; namely, whether the district court was correct in finding that the plaintiff had not misrepresented but had adequately disclosed its profit for the month of December 1947 in the statement of earnings which it set forth in the prospectus; for, if the prospectus contained such a misrepresentation, as will appear, neither Otis nor First California was under any obligation on February 9, 1948 to accept the stock and Otis would have a complete defense to all the causes of action stated in the complaint.

The stock issue which was the subject of the contract at bar was to have been the third issue of Kaiser-Frazer stock since its organization in 1945, and its first issue after January 1946. In the early part of 1948, when this issue was contemplated, Kaiser-Frazer was as yet a newcomer to the automobile industry; production of its cars did not get underway until late 1946, and volume production was not achieved until the spring of 1947. While the postwar period in the automobile industry was abnormal in the sense that a strong "sellers'" market prevailed, nevertheless the problems of production and competition

confronting one in Kaiser-Frazer's position were of sufficient magnitude to make the venture highly speculative. Under such circumstances it is evident that the prospective purchaser of Kaiser-Frazer stock would rely heavily on the corporation's sales and earnings during the last quarters of 1947 as the best and perhaps the only available indication of its ability to compete with the established automobile manufacturers. Indeed, the defendant contends that without a favorable picture of earnings for that period the proposed stock issue could not have been made. In any event, Kaiser-Frazer elected to set forth in the prospectus a table summarizing its sales and earnings in capsule form and "designed to apprise the investor, in a convenient fashion, of the financial results of the operation of the business * * *" SEC Accounting Series Release No. 62, 3 CCH, Fed. Sec. Law Rep. para. 72,081. It is apparent, then, that the table summarizing earnings was an important factor in the sale of the stock and, that being so, failure to make full disclosure therein of all the facts bearing upon the Corporation's earnings constituted a breach of the contract and violated the Securities Act of 1933 as well. 15 U.S.C.A. § 77l.

The following is a quotation of the summary earnings table, with text and footnotes, as it appeared in the prospectus:

"Summary of Consolidated Sales and Earnings

"The following summary reflects consolidated sales and earnings of the Corporation from its inception to December 31, 1947. The information for the period ended December 31, 1945, and the year ended December 31, 1946 as shown in the table, and for the six months ended June 30, 1947 (as explained in note 2) has been prepared from profit and loss statements examined by Touche, Niven, Bailey & Smart and should be read in conjunction with the financial statements for such periods included herein and the accountants' report thereon. The information shown in the table for the eleven months ended November 30, 1947, and the breakdown into the three

fiscal quarters and the two months period comprising such eleven months, has been taken from profit and loss statements prepared by the Corporation from its books and accounts, without audit, and should be read in conjunction with the unaudited eleven months financial statements and schedule included herein. The tentative information shown in the table for the quarter and for the year ended December 31, 1947, has been prepared by the Corporation from its books and records, without audit, on the basis of a preliminary 1947 closing made at January 23, 1948.

| Period | Sales and Miscellaneous Income | Cost of Sales | Selling and Adminis- trative Expenses | Other Deduc- tions or Credits* —Net | Net Profit or Loss* |
|---|---|---|---|---|---|
| From August 9 to December 31, 1945.... | $ 10,979 | $ 224,607 | $ 551,988 | $ 7,104 | $ 772,720* |
| Year ended December 31, 1946 .......... | 11,657,972 | 28,092,530 | 2,940,877 | 90,754* | 19,284,681* |
| Eleven months ended November 30, 1947.. | 227,560,032 | 204,674,595 | 6,751,960 | 637,729 | 15,495,748 |
| Quarter ended March 31, 1947 (2) ....... | 27,305,035 | 29,366,660 | 1,093,542 | 81,127 | 3,236,294*(1) |
| Quarter ended June 30, 1947 (2) ....... | 53,142,946 | 50,255,274 | 1,640,776 | 198,641 | 1,048,255 (1) |
| Quarter ended September 30, 1947..... | 78,527,735 | 67,890,777 | 2,150,261 | 209,388 | 8,277,309 (1) |
| Two months ended November 30, 1947.. | 68,584,316 | 57,161,884 | 1,867,381 | 148,573 | 9,406,478 (1) |
| * * * * | * * * | * * | * * | * * | * * |
| Quarter ended December 31, 1947 (4).... | 101,999,563 | 84,519,665 | 3,850,916 | 213,121 | 13,415,861 (1) |
| Year ended December 31, 1947 (4)........ | 260,975,279 | 232,032,376 | 8,735,495 | 702,277 | 19,505,131 (1) |

"Notes:

"(1) But for the operation of the loss carry-over provisions of the Internal Revenue Code, and the loss for the three months ended March 31, 1947, the profits shown above would have been subject to Federal income taxes in approximately the following amounts:

Quarter ended June 30, 1947 ................... $ 420,000
Quarter ended September 30, 1947 ............. 3,310,000
Two months ended November 30, 1947 .......... 3,765,000

$7,495,000
Less reduction in tax due to loss for quarter ended
    March 31, 1947 ..............................1,295,000

Eleven months ended November 30, 1947......... $6,200,000

"On a similar basis the Federal income taxes applicable to the quarter and to the year ended December 31, 1947 would have been $5,365,000 and $7,800,000 respectively.

"(2) The aggregate information for the six months ended June 30, 1947, agrees with the profit and loss statement for such period included herein and reported upon by

Touche, Niven, Bailey & Smart. However, the segregation of such aggregate information so as to show the two quarters separately has been prepared by the Corporation, without audit.

"(3) The 'excess of fair value of shares issued to Graham-Paige Motors Corporation over book amount of net tangible assets received therefor' is to be written off by charges to profit and loss over a period of five years beginning January 1, 1948. This will result in a charge of $542,943 annually.

"(4) The tentative information for the quarter and year ended December 31, 1947, reflects various substantial year end adjustments including provision for certain reserves and a material increase in inventories to conform to the results of the complete physical inventory taken by the Corporation as of December 31, 1947. In connection with the loss of the Corporation for the fiscal year ended December 31, 1946, attention is called to the fact that the Corporation made no sales until the fourth quarter of such year. Sales in such quarter amounted to $11,504,443, as compared with sales of $78,466,238 in the third quarter of the fiscal year 1947."

The above table contains no figure purporting to be the December 1947 profit as such; however, by subtracting the profit for the two months ending November 30, 1947 from the quarter ending December 31, 1947 profit, a figure of $4,009,383 is obtained which one would naturally assume to represent the profit of the Corporation for the single month of December 1947. Kaiser-Frazer argues that the average person reading the prospectus would not make this arithmetical calculation and hence his judgment would not be affected by any consideration of what the December profit was represented to be.[3] But, as pointed out earlier, because of the comparatively brief earnings record of the Corporation and the speculative nature of the venture in which it was engaged, we think that the average prospective purchaser of Kaiser-Frazer stock would have made the subtraction and would have concluded that the December earnings totalled nearly four million dollars. It is, however, sufficiently clear from the record that December earnings from the Corporation's operations were nowhere near that amount, but were rather in the neighborhood of $900,000. The difference in amount was due to the fact that a physical inventory was taken in the latter part of December 1947, at which time it was discovered that the Corporation had a much larger inventory than had been anticipated. The net amount of the adjustment that was made to reflect this fact was the sum of $3,371,-155, which Kaiser-Frazer simply included under the final quarter's earnings in the summary. Actually, the increase in profit resulting from the larger inventory was allocable not only to the month of December or the last quarter of 1947, but to the entire year's operations and in part to prior years; for in effect the larger inventory meant that Kaiser-Frazer had been charging too much to cost of sales for those periods. Indeed, the Corporation's "Consolidated Statement of Income and Expense" for December 1947, prepared for its own use, summarized the month's operation as follows:

"Net Profit or (Loss) for the Month of December, 1947 .......... $  638,226.97 [4]

3. We do not see how Kaiser-Frazer can derive any comfort from this argument. Even assuming that there was no representation as to the profit for the month of December 1947, nevertheless it cannot be disputed that the profit for the final quarter was shown in the summary as amounting to $13,415,861. This figure, however, included the inventory write-up which should have been reallocated to prior periods. See infra. Using Kaiser-Frazer's own reallocation of the inventory write-up, the final quarter profit was only $11,170,597. Consequently, at best there was a misrepresentation of the final quarter profit to the extent of $2,245,264.

4. Some of the inventory write-up, approximately $260,000, was allocable to the month of December which accounts for

Prior Months' Adjustments (see notes).... 3,371,155.56"
Moreover, Kaiser-Frazer's own expert accounting witness, Hollis, did not deny that the inventory write-up should have been allocated to prior periods. He did, however, give testimony and presented exhibits to the effect that a complete reallocation of expenses that had been charged to December would yield a profit of about $2,900,000, which in turn would mean that the amount of the overstatement of December earnings was only a little over $1,000,000. But his testimony on this point is unacceptable, for his method of reallocation was entirely opposed to the accounting system that had been utilized by the Corporation and upon which the summary was based. For example, he wrote off steel variances [5] in the amount of $1,066,027 paid in December, whereas the Corporation had in the past always charged such variances as an expense to the month in which the steel was purchased; also, he wrote off all advertising expenses for the month of December although it was not disputed that the Corporation had advertised extensively in that month.[6]

The district court found that the "summary of consolidated sales and earnings for the final quarter of the year 1947, set forth on page 7 of the prospectus, was computed in accordance with accepted accounting procedures," and that it was not misleading. With this conclusion we cannot agree. For, regardless of whether its accounting system was a sound one, Kaiser-Frazer stated its earnings in such a way as to represent that it had made a profit of about $4,000,000 in December 1947.

This representation was $3,100,000 short of the truth. Concededly, the profits for the year as a whole were substantially unaffected by the overstatement of December earnings, but the prospective purchaser was entitled to a full disclosure of all the facts that were known to the Corporation at the time the prospectus was issued; and the Corporation knew on February 3, 1948 that its profit for the month of December 1947 was less than $1,000,000. The source of the profit as stated in the prospectus for December could have been readily disclosed by a footnote to the earnings table. The footnote that appeared in the prospectus [7] as issued was entirely insufficient for this purpose. No one reading it would have been put on notice that the actual profit for December was less than a fourth of what was indicated by the table.

Kaiser-Frazer urges that since Otis had full knowledge of all the facts prior to the time it entered into the underwriting agreement, Otis cannot now rely on such facts as constituting a breach of warranty. Factually there is some support for Kaiser-Frazer's contention; the testimony at the trial indicates that representatives of Otis at least were informed of the actual December earnings and apparently took part in the preparation of the registration statement and the prospectus. But whatever the rules of estoppel or waiver may be in the case of an ordinary contract of sale, nevertheless it is clear that a contract which violates the laws of the United States and contravenes the public policy as expressed in those laws is unenforceable.[8] E. E. Taenzer & Co. v.

the difference between $638,226.97 shown in this statement as December profit and the $900,000 figure referred to earlier in the text.

5. Steel variance is the excess of the price paid by the Corporation for steel purchased over the price at which the steel was included in inventory.

6. The December advertising expenses, amounting to $758,000, were not included in the summary shown in the prospectus because the billings for that month had not been cleared through Kaiser-Frazer's accounting office when the books were closed. Consequently, when the accountant Hollis wrote off the November advertising expenses, which had been charged to December, his final profit figure of $2,900,000 did not include any charge at all for advertising expenses.

7. This footnote is footnote (4) in the summary earnings table quoted earlier in the text.

8. Further support for our holding may be found in § 14 of the Act of 1933, 15 U.S. C.A. § 77n, which provides as follows:

844

Chicago, R. I. & Pa. Ry., 6 Cir., 191 F. 543, certiorari denied, 223 U.S. 746, 32 S.Ct. 533, 56 L.Ed. 640; cf. Sola Electric Co. v. Jefferson, 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165. This is so regardless of the equities as between the parties for "* * * the very meaning of public policy is the interest of others than the parties and that interest is not to be at the mercy of the defendant alone." Beasley v. Texas & Pacific Ry., 191 U.S. 492, 498, 24 S.Ct. 164, 48 L.Ed. 274. Any sale to the public by means of the prospectus involved here would have been a violation of the Securities Act of 1933, 15 U.S.C.A. § 77l(2). While it may be argued that the enforcement of the underwriting contract according to its terms would result only in the sale of the stock to Otis and that such a sale would not violate the Act, see 15 U.S.C.A. § 77d(1), we are satisfied that the contract was so closely related to the performance of acts forbidden by law as to be itself illegal. We cannot blind ourselves to the fact that the sale of this stock by Kaiser-Frazer, though, in so far as the particular contract was concerned, was a sale only to the underwriters, was but the initial step in the public offering of the securities which would necessarily follow. The prospectus, which has been found to have been misleading, formed an integral part of the contract and the public sale of the stock by the underwriter was to be made and could only have been made in reliance on that prospectus. 15 U.S.C.A. § 77e(b) (2). We therefore conclude that the contract was unenforceable and that Kaiser-Frazer was not entitled to recover damages for Otis' breach thereof. See Restatement of Contracts, §§ 580, 598. It also follows from what has been said that there having been no enforceable contract, Otis is not liable in damages for interfering with the performance of the underwriting contract by First California.

The judgment is reversed and the case remanded to the district court with directions to enter judgment for the defendant.

"Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void."

The broad language of this section may be construed to brush aside ordinary contract principles of estoppel and waiver that might otherwise apply to contracts for securities, including underwriting agreements.