**REPUBLIC TECHNOLOGY FUND, INC.,**
Plaintiff-Appellant,

v.

The **LIONEL CORPORATION,**
Defendant-Appellee.

The **NEW ENGLAND INDUSTRIES,**
**INC., Plaintiff-Appellant,**

v.

The **LIONEL CORPORATION,**
Defendant-Appellee.

Nos. 529, 530, Dockets 72–1901, 72–1902.

United States Court of Appeals,
Second Circuit.

Argued March 13, 1973.

Decided July 17, 1973.

Sheldon H. Elsen, Orans, Elsen & Polstein, New York City (Lewis Shapiro and Leslie A. Lupert, New York City, on the brief), for plaintiffs-appellants.

James E. Tolan, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City (Judith S. Kaye, New York City, on the brief), for defendant-appellee.

Before HAYS, MULLIGAN and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This case is the unhappy aftermath of a corporate marriage gone sour, with the bride's family claiming that the groom failed to disclose a number of liabilities at the time of the negotiations leading up to the nuptials. The appeal is from a judgment absolving the appellee from liability under either contractual or securities law in connection with an interim (six months') financial statement, used in proxy materials and in a registration statement, prepared relative to the merger of Hathaway Instruments, Inc. ("Hathaway"), into The Lionel Corporation ("Lionel"). Appellants were stockholders in Hathaway. Their principal claim below and here is that the interim statement (and hence the proxy materials and registration statement) was misleading in that it artificially inflated earnings because it did not reflect $2,221,000 of adjustments that at year's end were ultimately required and also because it contained no write-off of good will of a subsidiary that was losing money at the time. The case essentially involves, therefore, the scope of a corporation's duty to make its interim financial statements accurately reflect the real state of fiscal affairs prior to a merger, or, put another way, the extent to which in an interim statement adjustments that are or should be made at year's end must be anticipated.

## I. FACTUAL BACKGROUND AND PROCEEDINGS BELOW.

Appellants are both investment funds. Appellant Republic Technology in July, 1960, purchased 25,000 shares of common stock in Hathaway. This stock was not registered but Hathaway had agreed to use its best efforts to cause it to be registered on request from Republic Technology. Appellants between them later purchased another 40,000 shares of Hathaway stock in March, 1961.[1] In return, Hathaway agreed that it would prepare and file with the SEC a Registration Statement for the stock on or before May 15, 1961, and that it would use its best efforts to the end that such reg-

---

1. There were 1,022,727 shares of Hathaway stock as of the effective date of the Hathaway-Lionel merger on November 6, 1961.

istration would become and remain effective for a period of not less than 24 months from the effective date thereof. No request to register was required under the March, 1961, purchase.

Lionel was the well-known toy and train manufacturer that, after some years of successful operations, entered into a program of corporate acquisitions, one of which was Anton-Imco Electronics Corp., which in turn owned Intercontinental Manufacturing Co., Inc., and Anton Electronics Laboratories Inc. (Anton-Imco and its two subsidiaries are sometimes collectively referred to herein as the "Anton-Imco" or "electronics division" of Lionel.) Further to complicate matters a little, the Anton Electronics Laboratories Inc. corporate name was changed in March of 1961 to Lionel Electronic Laboratories Inc. (hereinafter "Lionel Labs"), but it remained with Intercontinental a subsidiary of Anton-Imco. Lionel Labs made "radiation detection and measuring devices" and "electronic and electro-mechanical devices." Intercontinental manufactured aircraft and missile components. These last two together provided, apparently, some "glamor" to the corporate package. Other Lionel acquisitions included Airex, a fishing tackle concern, and Telerad, a "microwave components" concern. Up to the ultimate Hathaway merger in November, 1961, the stock of Lionel had been selling at two to four times its book value despite the fact that even on the June 30, 1961, interim statement here in dispute Lionel was losing money during the first six months of 1961.

Prior to the Lionel merger, appellant Republic Technology exercised its option to request registration of its Hathaway shares and on or about May 7, 1961, Hathaway filed a registration statement. When merger discussions with Lionel commenced in June of 1961, however, Hathaway requested permission from the SEC to withdraw this registration statement. This permission was not granted until late September when Lionel filed its registration statement with the SEC.

Meanwhile, however, unaudited financial statements for the six months' period ending June 20, 1961, had been prepared for Lionel and Hathaway and a combined pro forma for that period had also been prepared. These figures showed a six months' loss for Lionel of $84,000 or $.06 per share and a combined pro forma profit of $245,000 or $.08 per share. It is the omission of the Lionel statement to show certain adjustments made at year's end or to take into account by way of adjustment to Anton-Imco good will that subsidiary's losses that is the crux of the controversy here.

The interim statements were used in connection with the agreement of merger dated September 15, 1961. Under its terms Lionel agreed to file on or before October 15, 1961, a registration statement covering all stock acquired by Hathaway stockholders which by previous agreement Hathaway was legally obligated to register. Lionel also agreed to undertake Hathaway's obligations to effectuate and maintain the effectiveness of a registration statement. The same six months' figures were used in the proxy materials submitted to Hathaway and Lionel stockholders to obtain their approval of the merger, which approval ensued on October 25, 1961, effective on November 6, 1961. They also were used in the registration statement, Form S–1, filed with the SEC on September 28, 1961, by Lionel. Pursuant to the merger appellants exchanged their 65,000 shares of Hathaway common for 21,667 shares of 3¾% convertible preferred stock of Lionel.

There were a number of adjustments recorded as of December 31, 1961, as a result of the year-end audit or of events occurring during the fourth quarter of 1961. Of these, the ones appellants most insistently claim should have been reflected in the June 30 interim statement are:

1. Inventory write-downs: In Lionel's toy and train division $262,830 for

inventory obsolescence was written down in the fourth quarter or written off as at December 31; $140,000 was a write-off as "raw material price variance," $77,946 was a write-down to lower of cost or market; and the rather remarkable sum of $256,000 was written off as "unlocated difference between December 31, 1961 book and physical inventory." In Lionel's Telerad division $100,000 of inventory was written off in the fourth quarter and $440,000 was required to be written off at year's end. In Lionel Labs $200,000 was written down in inventory at year's end. The total of these year-end write-offs was $1,476,776.

2. Sales returns and allowances: A total of $106,000 was provided at year's end for sales returns and allowances in the toy and train division and the Airex division.

3. Research and development: Research and development costs totaling $226,983 in the toy and train division and $163,000 in Lionel Labs were written off at year's end.

4. Deferred selling, advertising and service expense: Lionel wrote off $249,000 of these expenses in its toy and train division at year's end.

The total of the above adjustments which were made at year's end is $2,221,659.

Appellants also claim that the interim statement:

5. Should have reflected a write-off in good will attributable to Lionel's Anton-Imco division, which was carried at $998,000, despite a $189,000 loss for the first six months of 1961;

6. Should have reflected a greater reserve for bad debts, sales returns and allowances;

7. Should not have included two credit items (one for sales returns and allowances of $24,000 and one for cooperative advertising expense at $19,234)

and one government contracts item of $51,369.

Appellants point out that each $30,000 of adjustments would have reduced profits shown in the proxy materials and registration statement by one cent per share (of the merged company). Indeed, after the year-end adjustments were actually made, without even counting any write-down of Anton-Imco good will, the consolidated profit expected to be shown in the interim statement became a loss in the sum of $1,898,609, and when added to this were $633,668 of special charges, the overall loss totaled over $2.5 million or $1.71 per share.[2]

The district court, sitting without a jury, took testimony both from appellants' accounting expert, Mr. Duchan, and from Mr. Easton, the senior managing accountant for S. D. Leidesdorf & Co. ("Leidesdorf"), independent certified public accountants, who worked on the Lionel audits in 1960 and 1961. Mr. Easton testified both to his preparation of the financial statements in question and as an accounting expert. It may not come as a surprise that while Mr. Duchan testified that in his opinion the June 30 statement should have reflected a substantial portion of the adjustments that were actually made at year's end, Mr. Easton's testimony was to the effect that the interim statement was accurate (in addition to being in accordance with the same generally accepted accounting principles used in Lionel's year-end statements and its prior financial statements).

The district court in an opinion printed at 345 F.Supp. 656 (S.D.N.Y.1972) held that plaintiffs (appellants) had "not established by a fair preponderance of the evidence that the June 30 Financial Statements were materially false or that Lionel omitted to state any material fact necessary to make the statements not false or misleading." 345 F.Supp.

2. The "special charges" apparently did not relate to the items objected to by appellants but to moving, consolidation, contractual and uniform accounting expenses; one might call them the hidden expenses of merger.

at 662. It sought to distinguish Kaiser-Frazer Corp. v. Otis & Co., 195 F.2d 838 (2d Cir.), cert. denied, 344 U.S. 856, 73 S.Ct. 89, 97 L.Ed. 664 (1952), on the ground that the Kaiser-Frazer management used figures in its interim statement that they knew to be untrue while there was no evidence that the Lionel management acted similarly. 345 F. Supp. at 663. It found no violations of § 17 of the Securities Act of 1933, 15 U.S.C. § 77q, or of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. While holding that the Hathaway proxy statement was not subject to § 14 of the 1934 Act, 15 U.S.C. § 78n(a), and Rule 14a–9, 17 C.F.R. § 240.14a–9 (since the Hathaway common was not registered), the court also held that plaintiffs had failed to establish that the proxy statement was materially misleading or that it had omitted material facts necessary to make it not false or misleading. 345 F.Supp. at 663 n.6. With respect to the contractual claims, the court found that the interim financial statements were not materially misleading, and that the Lionel registration statement and prospectus did become effective within a reasonable time. Further, the court held that Lionel had discharged its obligation as Hathaway's successor to use best efforts to keep the registration statement and prospectus effective, because it was the unwillingness of the auditor to certify the necessary financial statements due to Lionel's accumulating losses that largely led to delay in registration and the ineffectiveness of the registration. The complaint was accordingly dismissed. We will discuss the securities law claims separately from the contractual law claims, and in that order.

## II. SECURITIES LAW CLAIMS.

**A.** *Section 14 and Rule 14a–9.* We commence by agreeing with the district judge in respect to his treatment of the claim under Securities Exchange Act § 14 and Rule 14a–9. The claimed violation of the proxy rules must fail because proxies were not solicited "in respect of any security . . . registered pursuant to section 12" of the Act. Securities Exchange Act of 1934, § 14(a), 15 U.S.C. § 78n(a); SEC Rule 14a–2, 17 C.F.R. § 240.14a–2. *See* 5 L. Loss, Securities Regulation 2835–36 (1969). Thus, whatever the scienter requirement in respect to a private action for damages to redress a § 14 and Rule 14a–9 violation, *see* Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281 at 1299–1301 (2d Cir., May 9, 1973), there is simply no liability in respect to proxy-rule violations here.

**B.** *Rule 10b–5, § 17 and Lionel's Interim Accounting.* Under both Rule 10b–5 and § 17 of the Securities Act of 1933, 15 U.S.C. § 77q(a), however, it is necessary to determine whether Lionel made "any untrue statement of a material fact" or an omission "to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. . . ." Were the interim financial statement and the proxy statement and initial registration statement which utilized the interim statement "misleading" in view of "the circumstances" underlying the transaction?[3] In answering this question we must, of course, give full weight to the district court's findings of fact, even while we are free to look to the application of the securities law to the facts found. *See* Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341 at 364 (2d Cir., 1973), (opinion of Timbers, J.). Taking the evidence in

---

3. Securities issued or surrendered in a merger are purchased or sold for 10b–5 purposes. Dasho v. Susquehanna Corp., 380 F.2d 262, 266–267 (7th Cir.), cert. denied sub nom. Bard v. Dasho, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967). *See* 1 A. Bromberg, Securities Law Fraud, SEC Rule 10b–5 § 6.5(2) at 138–38.1 & 138.1 n. 95 (1971).

the light most favorable to the defendant, Lionel, we nevertheless find certain omissions in the interim statement to have been misleading.

■ 1. *Anton-Imco Good Will.* We commence with the $998,000 item for good will of Anton-Imco Electronics Corp., as to which the interim statement of earnings reflected no discount even though this subsidiary had sustained a loss of $188,842 as of June 30.[4] Mr. Easton, Lionel's auditor, acknowledged that the operating loss of Anton-Imco was a "factor to be considered" in deciding whether there was a diminution of the good will. He felt, however, that this single factor was outweighed by the fact that Anton-Imco was only in its first year of operation as a Lionel subsidiary and in his words was "engaged in the development of a new machine—I believe it was a money sensor, a money changing device—and based on all the information that was available at that time the prospects for success seemed very reasonable." Thus, in the opinion of Mr. Easton, credited by the district court, despite Anton-Imco's losses there was no "diminution in value" of its good will.

We cannot accept Mr. Easton's evaluation as a matter of law. The notes to the consolidated interim statements of income contain the following statement:

> This company recently designed and developed a currency recognizing device, several prototype models of which have been built up to this time. The device has not yet been marketed and there is no assurance at this time as to whether it will be a profitable item.

Nowhere do the notes in any way indicate that Anton-Imco had shown a $189,000 loss as of June 30 or that the

retention of $998,000 as its good will was based upon the prospects of success of this currency recognizing device which had not yet been marketed. *Cf.* Petersen Engine Co., Inc., 2 S.E.C. 893, 906 (1937); Lewis American Airways, Inc., 1 S.E.C. 330, 342 (1936) (misleading to designate "patent applications" as "patent rights" or "patents" under intangible assets heading in a balance sheet). Indeed, since the interim statements do not include a balance sheet but only consolidated statements of income they contained no reference at all to the good will item. This makes them, in our view, all the more misleading. The person viewing the statements would have no reason to suspect that the consolidated earnings were at least subject to question since despite a loss on the part of a major division for the first half-year, its good will was still being carried at a full initial valuation equivalent to about 8 per cent of the Lionel total book value.[5] *Cf.* R. Mautz, Financial Reporting by Diversified Companies 157–58 (1968) quoted in T. Fiflis & H. Kripke, Accounting for Business Lawyers 556–57 (1971) (investor needs to know "relative importance" of several industries comprising a diversified corporation accurately to forecast future prospects). This is particularly so when the notes emphasize optimistic items, *e. g.*, calling attention to the fact that the interim statement did not include certain "special items" (including such things as elimination of a $22,444 reserve for certain employee benefits) that would have improved the earnings by $.10 per share in toto for the first six months of 1961. In other words, the voters on the merger were being shown the frosting on the cake with no allusion in the statements to the fact that a substantial part of the cake itself was dried out, if not mil-

---

4. For the full 12-month period the loss was some $724,000 and there was apparently considered at year's end a partial write-down of $307,984 in the good will item, but this was not taken.

5. The exhibits supplied do not contain any balance sheet. But the proxy statement

in support of the merger sets forth a $9.89 per share book value for Lionel stock as of June 30, 1961, and that there were 1,138,455 shares of Lionel stock outstanding at that date. This would result in a total Lionel book value of $11,259,519.95.

dewed. *Cf.* Globe Aircraft Corp., 26 S. E.C. 43, 46–47 (1947).

At the very least, good disclosure accounting would have required the notation of some uncertainty regarding the overall interim Lionel profit picture based on this item alone, uncertainty which should have been footnoted, to avoid misleading the stockholder. *See* SEC Accounting Series Release No. 62, 4 CCH Fed.Sec.L.Rep. ¶ 72,081 at 62,149 (1947) (footnoted explanation must be included in a summary earning statement if the information it would contain is of such "special significance [that] . . . its omission would be likely to give rise to misleading inferences"). *Cf.* Metropolitan Personal Loan Corp., 7 S.E.C. 234, 239 (1940) (even assuming deferred asset account could be written off in a single year, footnoted explanation required to make income statement not misleading). While stockholders who are voting on a merger are not to be treated like "children in kindergarten," *cf.* Gerstle v. Gamble-Skogmo, Inc., *supra*, 478 F.2d at 1297, they are entitled to disclosure of the bitter with the sweet. They are at least entitled to assume that the interim financial statements furnished them by their own company or the other party to the merger will give them better than "ballpark" figures and be based on principles of conservatism which the American Institute of Certified Public Accountants speaks of as "a general tendency toward early recognition of unfavorable events and minimization of the amount of net assets and net income." I APB Accounting Principles § 1022.27 at 140 (CCH ed. 1971). The stockholders are entitled to assume that uncertainty concerning profit or loss should be at least footnoted in the first financial statement issued after the uncertainty arises.

This is, perhaps, another way of saying that in a day and age of mergers and conglomerates—Lionel in the 1960 era was what might be called a baby conglomerate, branching out from toy trains to outboard motors, fishing tackle, electronic and nuclear instruments, and educational science toys, among other things, in addition to "currency sensors"—it is as important to shareholders, perhaps more so, that interim statements issued for merger approval purposes accurately reflect corporate events as that the year-end financial statement dressed in the pretty package of an annual report be in accordance with sound or generally accepted accounting principles. Fairly to be able to vote on a merger requires accurate information. Perhaps nothing is more relevant to a vote on whether or not to approve a merger than the earnings picture of the acquiring company, at least to the stockholder of the company being acquired. As was said by Judge Augustus Hand in the somewhat different but nevertheless analogous situation of a registration statement regarding stock in a new automobile company, "it is evident that the prospective purchaser of . . . stock would rely heavily on the corporation's sales and earnings during the last quarters . . . without a favorable picture of earnings for that period the proposed stock issue could not have been made." Kaiser-Frazer Corp. v. Otis & Co., *supra*, 195 F.2d at 840. Here, as there, sales and earnings were set forth in summarized form in a table and "[i]t is apparent, then, that the table summarizing earnings was an important factor in the sale of the stock (or merger, as the case might be) . . . ." *Id.* Here, as there, "failure to make full disclosure therein of all the facts bearing upon the Corporation's earnings" was misleading. *Id.* We do not agree with the district court that *Kaiser-Frazer* is distinguishable from this case. Here, as there, the accounting presentation in the summary income statement did not disclose facts of real significance to the voting stockholder. Issues of scienter are and should be separable from the question whether the financial statements were in fact misleading. (*See* Part IIC of this opinion *infra*.) We hold that the omission by Lionel to make any reference in the interim statement to the substantial

good will item and the significant interim loss, when coupled with mention of the unmarketed "currency recognizing device" was misleading as a matter of law.

■ 2. *Inventory Write-downs*. The same does not hold true, however, for the extraordinarily high inventory adjustments made at year's end in reference to the toy and train division and the Lionel Labs. Only a year's end physical inventory was taken; the interim statements point this fact out and indicate that merchandise inventories in the interim statements were "estimated by the management by adding purchases, direct labor and factory overhead . . . and deducting therefrom estimated cost of goods sold," the interim overhead being allocated to the cost of goods sold on the basis of 1960 and 1961 estimated annual production and sales. This disclosure makes virtually unassailable the district court finding that at least as regards the $77,946 "shrinkage" and the $256,000 "unlocated difference" items in the toy and train division there was nothing misleading. To discover a shrinkage or lost (or stolen) merchandise requires a physical inventory, and there is no contention here, nor was there any below, that a physical inventory should have been taken as of June 30.

The statement in the notes also supports the findings in reference to the $540,000 written off at year's end in the Telerad Division; according to Easton's testimony he made inquiry in connection with the June 30 statement and ascertained that the general manager of the Telerad Division expected the rather large inventory accumulation to be recoverable in future sales. The notes to the interim statement indicate that the inventory figures were based on management estimates and there was no evidence from which the court below

could have found that the Telerad estimate was unreasonable at the time it was made.[6]

There was also a $262,830 year-end adjustment in the toy and train division for "inventory obsolescence" and an unexplained $200,000 write-down in the Lionel Labs inventory. Besides a passing reference to the existence of the $200,000 Lionel Lab inventory write-down in a footnote, however, the court's opinion or findings do not mention it further. But the trial court found that because the toy and train business was seasonal, the season being a Christmas one, with less than 10 per cent of the company's business emanating from the spring toy sale, the obsolescence could not have been anticipated as of June 30; again we cannot disregard this finding, one of fact.[7] From this, coupled with the court's other findings in respect to inventory write-downs and the absence of any evidence indicating that something occurred prior to June 30 to warrant a write-down for obsolescence or the like, we believe that the court below treated this write-down as similar to others. If we are wrong, however, the district court will have an opportunity to correct us on the remand of the case.

■ The inventory adjustment most difficult to deal with is the year-end $140,000 "raw material price variance," because it would seem fairly certain that manufacturing and raw material purchases must have occurred well before June 30, even in the Christmas seasonable toy and train division. The court's "finding" that "there was no evidence presented from which the need of such an adjustment could be determined, or any evidence as to Lionel's raw material purchases during the six-month period," 345 F.Supp. at 660, must be examined in the light of the expert testimony that generally accepted accounting principles

---

6. Which is not to imply that negligence alone is enough to support a 10b–5 violation. *See* Part IIC of this opinion *infra*.

7. Technically, this was not a finding, but rather a repetition in the court's findings

of Easton's testimony. This was true in a number of instances, and we would caution that a mere repetition of testimony is not a finding. *See generally* 2B W. Barron & A. Holtzoff, Federal Practice and Procedure § 1127 (1961).

require interim inventory adjustment and the likelihood that a substantial portion of the raw material purchase price variance was known to Lionel before June 30. These facts seem to us to place on Lionel the burden of going forward with evidence to show that no adjustment needed to be made; here there was every reason to suppose that a substantial portion of the variance occurred prior to the date of the issuance of the statements for merger purposes. *Cf.* Bowman & Bourdon, Inc. v. Rohr, 296 F. Supp. 847 (D.Mass.), aff'd per curiam, 417 F.2d 780 (1st Cir. 1960); T. Fiflis & H. Kripke, *supra* at 237–38.

■ 3. *Sales Returns and Allowances.* One might think indefensible the omission in the interim statements to make any adjustment for sales returns and allowances, items which amounted to $54,000 in the toy and train division and $52,000 in the Airex (sometimes referred to as the fishing tackle) division. An S–1 Registration Statement requires inclusion of "Gross sales less discounts, returns and allowances." 17 C.F.R. § 210.5–03–1A. Since the train business is, as we say, "Christmas seasonable," one would think that returns and allowances would occur early in the following year, and hence would have to be shown in the following interim statement. But the trial court accepted Mr. Easton's testimony that October, November and December sales would be reduced by January and February returns and allowances as meaning that only the year-end statement would show any substantial amount for returns and allowances. We are bound by that finding, which does not appear to be clearly erroneous.

As to Airex, the so-called fishing tackle division, there was evidence that the fishing tackle business is seasonal in the spring. There was also evidence, however, again from Mr. Easton and again believed by the trial court, that the Airex returns and allowances related to Japanese manufactured baseball gloves, golf equipment and some other equipment that Airex sold in the second half of the year, and that Airex had gone out of the fishing tackle business altogether in March of 1961. Here again Easton testified that no June 30 adjustment was required because the great bulk of returns and allowances occurred right *after* Christmas sales. The trial court accepted the testimony and its finding was not "clearly erroneous."

■ 4. *Research and Development.* Research and development (R & D) costs totaling $226,983 in the toy and train division and $163,000 in Lionel Labs were written off at year's end. It is no answer, we feel, to say as both Mr. Easton testified and the court "found" (again, basically repeating Easton's testimony) that "Lionel reviewed its research and development projects as at June 30" and when Easton's firm, Liedesdorf, made the year-end audit it found nothing to indicate that an adjustment for R & D expense write-off should have been made at June 30. Such findings tell us nothing about the basis for Lionel's and Liedesdorf's conclusions. It is a partial answer to say, as appellee's brief points out, that in fact $40,205.99 of R & D expense was written off at June 30, but an examination of the exhibit to which this refers shows that this was in the *electronics* division, for "abandoned projects." There remains unexplained why no adjustment was made at June 30 in the *toy and train* division, and here too we think the burden of going forward was upon Lionel. Here too we are talking about a substantial write-off item which at year's end represented about 2 per cent of the book value of the company, as well as several cents a share profit (or loss).

■ 5. *Deferred Selling, Advertising and Service Expense.* Some $249,000 of selling, advertising and service expenses were treated as "Deferred Charges" at June 30 and written off at the end of the year.[8] The court evident-

---

8. There is some confusion here, both in Easton's testimony and the court's findings

in the light of a Leidesdorf schedule prepared in April, 1962, indicating that per-

ly relied upon Easton's testimony in respect to the bad debt reserve differential between June 30 (a reserve for "Doubtful Accounts" of $72,000 against accounts receivable of $3,312,000 or 2.1 per cent) and year's end (a reserve of $315,000 for "Doubtful Accounts, Discounts, Returns and Allowances" against $3,649,000 of accounts receivable or 8.5 per cent). That testimony essentially pointed out that the reserve at year's end included a reserve for discounts, returns and allowances, items not included as of June 30. Appellants' response is that to the extent that the understatement in June involved sales returns and allowances it duplicates appellants' argument that a June 30 adjustment was needed for those items. Again, however, it must be remembered that Lionel's business was Christmas seasonal. Over-reporting of deferred expenses early in the year might well not have provided an accurate picture of the company's condition. Appellants failed to present evidence that the year-end reserves were overstated in relation to the full year's sales. For all we know the entire difference of almost 6 per cent between the ratio of reserve to accounts receivable in the interim and the year-end statements may be explained by the addition of a reserve at the end of the apparently bad selling year of 1961 for sales returns and allowances.

 6. *Miscellaneous Items.* The three miscellaneous items regarding a contract price adjustment on a government contract, a credit balance in sales returns and a credit balance in a cooperative advertising expense account together amount to about $94,000 and were treated by the court below as hav-

ing been too small to "have materially changed the overall [interim] picture. . . ." [9] 345 F.Supp. at 662. We are constrained to agree.

7. *Summary.* In summary, then, we believe that there was a misrepresentation in respect to the $998,000 good will item, the $140,000 raw material price variance and the $226,983 R & D costs in the toy and train division, and that on the basis of the evidence adduced the interim statement should have disclosed uncertainty regarding the first and made some adjustment in respect to the other two. Absent further proof we may assume that the adjustment should have equaled 50 per cent of the last two adjustments that were actually made at year end, or $70,000 and $113,491 respectively, sums which we find substantial enough to warrant consideration on remand.

C. *Materiality, Scienter and Reliance.* The district court did not consider separately the issues of materiality on the one hand and deceptiveness of the representations in the interim statements on the other hand. Rather, as we have indicated, its findings were basically to the effect that each of the alleged omissions did not involve a "misrepresentation." Since we have found, however, that in certain respects there were misrepresentations, we must remand unless we can say that under no construction of the evidence could the district court find that the misrepresentations were material or that there was established the necessary culpability on the part of Lionel.[10] We by no means can say so.

 We have touched upon the issue of materiality in reference to the An-

haps this item should have been written off as of September 30, 1962. The confusion is not aided by the somewhat arcane accountant's jargon describing this: "[d]eferred selling, advertising and service expenses deferred as at September 30, 1961, which should have been expensed at September 30, 1961, if the budgeted sales and expense used in the September 30, 1961, computation of the deferral were actual sales and expense for the year

1961." Since there is no indication that sales fell off projections before June 30, however, we need not probe the mysteries of this item.

9. The court also said there was "no showing that any of them involved a material misrepresentation." 345 F.Supp. at 662.

10. All of this relates solely to the alleged securities law violations. The contract claim will be dealt with separately. .

ton-Imco good will issue. Where a merger is in prospect, the earnings picture of the acquiring corporation has to be of real significance to the stockholders of the corporation proposed to be acquired, and the most current earnings are of the highest importance. *See* Kaiser-Frazer Corp. v. Otis, *supra*. Accordingly, failure to convey these earnings accurately, if the discrepancy is at all substantial, has to be material to the person being misled. The test in this 10b–5 and § 17 case is the same as set forth (albeit in a 14(e) case) by Judge Timbers:

> The concept of materiality focuses on the weightiness of the misstated or omitted fact in a reasonable investor's decision to buy or sell. We articulated the materiality standard in List v. Fashion Park, Inc., 340 F.2d 457, 462 (2 Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965), to be "whether 'a reasonable man would attach importance [to the fact misrepresented] in determining his choice of action in the transaction in question.'" The materiality test is concerned only with whether a prototype reasonable investor would have relied. See Heit v. Weitzen, 402 F.2d 909, 912–914 (2 Cir. 1968), cert. denied, 395 U. S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969). Account must be taken of all the surrounding circumstances to determine whether the fact under consideration is of such significance that a reasonable investor would weigh it in his decision whether or not to invest. See SEC v. Texas Gulf Sulphur Co., *Supra*, 401 F.2d [833], at 849 [(2 Cir. 1968) (en banc), cert. denied sub nom. Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed. 756 (1969)].

Chris-Craft Industries, Inc. v. Piper Aircraft Corp., *supra*, 480 F.2d at 341 (footnote omitted).[11]

The district court never reached the question of culpability. On remand it should do so, bearing in mind that to a large extent the accountants preparing the interim figures were relying upon management for information and advice. The test to be applied is clear in terms, if not in application. As explicated most recently in the opinions of Judge Timbers and Judge Mansfield in *Chris-Craft Industries, Inc.*, *supra*, slip op. at 362 (Timbers, J.) and at 396 (Mansfield, J.), something short of specific intent to defraud is required and something more than "mere" negligence; certainly, knowledge of the fact that the figures created a false picture is enough, and on the part of sophisticated corporate managers a reckless disregard of the truth is sufficient. *See* Lanza v. Drexel & Co., No. 35794, 479 F.2d 1277 at 1306 (2d Cir., Apr. 26, 1973), (en banc); Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445 (2d Cir. 1971) (dictum); Globus v. Law Research Service, Inc., 418 F.2d 1276, 1290–1291 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970); Heit v. Weitzen, 402 F.2d 909, 913–914 (2d Cir. 1968), cert. denied, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 854–855 (2d Cir. 1968) (en banc), cert. denied sub nom. Kline v. SEC, 394 U. S. 967, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). *See also* SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1096 n. 15 (2d Cir. 1972). We are satisfied that on the remand that we require, the district court will treat the issues of materiality and culpability with specificity

11. As refined in the opinion of Chief Judge Friendly in Gerstle v. Gamble-Skogmo, Inc., No. 72–2259, 478 F.2d 1281 (2d Cir., May 9, 1973), the standard of materiality in a case under § 14(a) where *negligence* alone suffices to establish culpability, at 1298–1301, is somewhat higher: " . . . a standard tending toward probability rather than toward mere possibility is," Judge Friendly said, "more appropriate."

*Id.* at 1302. Here of course this would be a § 14 action were it not for the fact that the securities were not registered. But to attempt to refine the standard of materiality even further to suit this case would, we think, be distinguishing, and dividing "A hair 'twixt south, and southwest side." S. Butler, Hudibras Pt. I, Canto I, l. 65.

and in the light of the more recent pronouncements of this court and its various panels.

### III. THE CONTRACT CLAIMS.

Appellants below claimed three separate breaches of contract by Lionel that were dealt with by the district court.[12] The first breach claimed was of the Agreement of Merger since the registration statement filed thereunder was materially misleading and hence defective. The trial court held that it was not "materially misleading" and hence against appellants on this claim. Since we have found it to have been misleading and leave open the question of materiality—to be decided under the less strict principles of contract law—we must remand in this respect also.

The second breach of contract claimed was that Lionel did not cause a registration statement to become effective with respect to appellants' stock within a reasonable time. The district court held that both Hathaway and Lionel filed registration statements within the time they were obliged to do so, and that the former's was withdrawn on account of the merger. It also found that, while Lionel's registration statement became effective after three amendments some 51 weeks after it was filed, this was not an unreasonable length of time, since Lionel was cooperative and the law firm representing it before the SEC was diligent and competent.

■ We disagree with the district court in respect to this second alleged breach. To the extent that the delay of one year occurring before the S-1 became effective was a result of the originally misleading interim statement accompanying the S-1, the delay may well have been unreasonable. There was expert testimony that six to eight weeks was all that should have been necessary to effectuate the S-1 since much of the work going into it had already been done by Hathaway and in connection with the proxy solicitation on the merger vote. In regard to the extent to which delay may have been precipitated by or contributed to by the misleading interim statements, both the findings and the evidence seem to be insufficient. One of the reasons for the delay stated by the court (in accord with the testimony of Lionel's SEC lawyer) was that based on preliminary figures that Lionel developed with regard to its year-end (1961) results, it became likely that amendment with a year-end audit would be required. Developing the audit, of course, took some additional time (during which a comparison of 1961 with the latest, i.e., 1962, figures also became required). But one of the reasons for the bad-looking year-end figure was that the interim statements filed with the S-1 had not truly reflected the worsening financial situation that appears to have been developing through the first half of 1961 while accelerating in the second half. Moreover, while we have said that there was insufficiency of proof to show that the interim statement was misleading in respect to inventory write-downs and sales returns and allowances (and reserves), the write-downs were ultimately rather huge in amount and whatever it was that brought them about may not necessarily be used to justify the delay in filing an effective registration statement that occurred. On remand these issues may be better explored, and the findings in respect to them stated in greater depth.

The third breach claimed was that Lionel did not maintain effective registration for 24 months within the meaning of Hathaway's obligation to appellants to which by the merger Lionel had succeeded. The trial court held, however, that since the failure to maintain effectiveness was due to the accountants' "unwillingness to certify the necessary Financial Statements because of Lionel's accumulating losses" and the institution

---

12. Appellants also claimed that the filing of an S-1 by Lionel did not really constitute a filing since it contained a materially misleading financial statement. In our treatment of the case this question need not be resolved.

of a lawsuit in the state courts of New York (said to have been by the appellants here on the same general grounds claimed in this action), 345 F.Supp. at 666,[13] there was, in the district court's view, no indication that Lionel had not used its "best efforts" to maintain effectiveness, which is all that it was required to do.

Much the same may be said of the alleged third breach as of the second. The court below found that to a certain extent the failure to maintain effectiveness of the registration was owing to the accountants' unwillingness to certify the necessary financial statements. According to the 1962 annual accountants' report, that unwillingness was based upon the failure of the company to maintain the net working capital required under the indenture covering its 5½ per cent convertible subordinated debentures and "the possible failure to observe other indenture covenants." Again, however, to the extent to which that unwillingness was precipitated or contributed to by the misleading interim statements, or to faulty information conveyed by management to the certifying accountants, there may have been an omission to use "best efforts" to maintain effectiveness. Here too on remand the issue may be explored in greater depth.

While the parties seek to have us rule on the additional defenses of abandonment, laches, estoppel and the running of the statute of limitations, these are all issues which the district court failed to reach, and absent specific findings we are not inclined to uphold or reject any of these defenses. *See* note 13, *supra*.

Reversed and remanded for findings in accordance with this opinion.

MULLIGAN, Circuit Judge (concurring):

While I concur in the reversal and remand here, I am not satisfied that the test of culpability under Rule 10b–5 has been articulated adequately in the majority opinion. Judge Oakes adopts the standard explicated in Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341 (2d Cir., 1973), in the opinions of Judges Timbers and Mansfield, and characterizes it as something short of specific intent and something more than mere negligence. In fact, the latest statement of the rule is in the *en banc* opinion of Judge Moore for this court in Lanza v. Drexel & Co., 479 F.2d 1277 (2d Cir., 1973), where we said: "In sum, we believe that proof of a willful or reckless disregard for the truth is necessary to establish liability under Rule 10b–5." (id. at 1306). Footnote 98 indicates the obvious—that in detemining the liability of a defendant, his corporate responsibilities must be taken into consideration.

Since this is the latest statement of the rule of this circuit and the *en banc* was granted primarily to clarify the rule, I see no reason at all for relegating it here to a list of some seven prior cases which we advise the court below to consider. I would now abide by the rule we so recently adopted.

---

13. The lawsuit was apparently brought on April 2, 1963, and was dismissed on May 11, 1966, for lack of prosecution. Appellee asserts it in bar here. Appellants claim that Lionel subsequently retained their lawyer (*cf.* Emle Industries, Inc. v. Patentex, Inc., 478 F.2d 562 (2d Cir., 1973)), and that he told the New York Stock Exchange at a Lionel delisting hearing that the state suit had been abandoned. In any event, the *instant federal action* was instituted by other counsel at or about the time of the dismissal of the state action in 1966, and after discovery the case was not tried under the old master calendar system until June 4, 1971, and not decided until June 21, 1972. The district court did not reach the questions of laches, estoppel, abandonment and expiration of the statute of limitations, *see* Sack v. Low, 478 F.2d 360 (2d Cir., 1973), raised by appellee here, but these defenses will be available on remand. *Cf.* Modrey v. American Gage & Machine Co., 478 F.2d 470 (2d Cir., 1973).