550 F.2d 505
 Fed. Sec. L. Rep. P 95,892, 1 Fed. R. Evid. Serv. 661
MARX & CO., INC., et al., Plaintiffs-Cross-Appellants,
v.
The DINERS' CLUB, INC., et al., Defendants-Cross-Appellees.
The DINERS' CLUB, INC., and Diners/Fugazy Travel, Inc.,
Defendants-Appellants,
v.
William D. FUGAZY et al., Plaintiffs-Appellees.
 Nos. 159, 177, Dockets 76-7050, 76-7069.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 18, 1976.
Decided Feb. 25, 1977.
 
 Joseph J. Santora, New York City (Hardee Barovick Konecky & Braun, New York City, of counsel), for defendants-appellants and cross-appellees; Robert B. Kay, Robert B. McKay, Stephen Ross and Salvatore A. Raniere, New York City, on the brief.
 James E. Tolan, New York City (Bruce E. Pindyck, Michael E. Twomey, Olwine, Connelly, Chase, O'Donnel & Weyher, New York City, and Barry I. Fredericks, Harris, Fredericks & Korobkin, New York City, of counsel), for plaintiffs-appellees and cross-appellants.
 Before HAYS, ANDERSON and GURFEIN, Circuit Judges.*
 GURFEIN, Circuit Judge:
 
 
 1
 This appeal by the Diners' Club, Inc. and Diners/Fugazy Travel, Inc. (collectively "Diners") arises out of a series of transactions whereby the Fugazys sold the assets of their company, Fugazy Travel Bureau, Inc.[1] ("Fugazy Travel") to Diners Club in return for unregistered stock in the latter company. The Fugazys, plaintiffs below, allege that the defendants fraudulently induced the sale, in violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, by representing that defendant Continental Corporation was about to "take over" Diners and that the failure of Diners to use its best efforts to make effective a registration of plaintiffs' shares was part of a manipulative device to induce the plaintiffs not to offer their shares for sale from October 10, 1967 to February 6, 1970.[2] The court ultimately submitted to the jury whether Diners breached its contractual obligation to use its best efforts to register the plaintiffs' stock.
 
 
 2
 The defendants filed various counterclaims alleging, inter alia, that they were fraudulently induced by misrepresentations of plaintiffs to purchase Fugazy Travel.
 
 
 3
 Jurisdiction was based solely on Section 27 of the Securities Exchange Act of 1934. While diversity jurisdiction was not alleged, there was a properly pleaded claim arising under Section 10(b) and Rule 10b-5 under the 1934 Act. During the trial the plaintiffs, without formal amendment, pressed a breach of contract claim based on a failure of Diners to use its best efforts to register the stock, which we shall treat as a pendent claim.[3]
 
 
 4
 The case was tried to a jury in the Southern District of New York before Honorable Robert J. Ward. The court directed a verdict for the defendants on the 10(b) claim and the plaintiffs appeal. The court entered judgment for the plaintiffs on a jury verdict holding Diners liable on a breach of contract claim in the amount of $533,000, plus pre-verdict interest, and finding for the plaintiffs on Diners' counterclaims and Diners appeals.
 
 
 5
 We affirm the dismissal of plaintiffs' § 10(b) claim as well as the dismissal of defendant's counterclaims. We reverse the judgment in favor of the plaintiffs for breach of contract, and remand for a new trial.
 
 
 6
 * Under an agreement dated October 10, 1967, Diners acquired the assets of Fugazy Travel in return for unregistered Diners stock and other consideration. Paragraph 10.2(b) of the acquisition agreement provided that, upon receipt of notification from plaintiffs that they desired registration, Diners would promptly file a registration statement for the unregistered Diners stock held by plaintiffs and would use its best efforts to cause the registration statement to become effective.[4] Plaintiffs requested Diners to file such a registration statement in April 1969. Preparation of the registration statement did not begin until July 1969, however, and it was not filed until August 28, 1969. This registration statement never became effective; it was ultimately withdrawn, over the protest of plaintiff Marx, early in 1970.[5]
 
 
 7
 The issues of fact tendered were whether Diners had filed a registration statement promptly upon request and whether it had used its best efforts to make it effective. Plaintiffs contended that Diners should have filed on or about June 20, 1969 when its audited financials for the fiscal year ending March 31, 1969 were available and that preparatory work should have been begun immediately upon receipt of the request.[6] Diners contended that it was under no duty to file immediately because of plaintiffs' failure and refusal to fulfill certain conditions precedent to such registration rights, such as tendering one-half of the costs of registration, together with an indemnity agreement which the plaintiffs allegedly refused to give until August 24, just four days before the actual filing.[7] Diners also contended that, after the plaintiffs had formally requested the registration on April 16, 1969, the plaintiffs, during the next six to eight weeks were advancing certain alternative proposals to avoid the necessity for filing a registration statement, and that this may have resulted in a delay in commencement of the preparation of the registration statement.[8] Diners also pointed out that it had the right, which it exercised, to include in its registration statement other securities and hence, it had to obtain information regarding the other security holders which may have resulted in a delay in filing.
 
 
 8
 With regard to whether Diners used its best efforts to make the registration effective, Diners contended that within two weeks of receipt of the SEC's comments on the registration, which was received about two months after filing, it wrote two letters in response and attended a conference with the Commission staff to resolve these comments. It also noted that William D. Fugazy himself testified that there were "monumental problems" in causing the registration statement to become effective.
 
 
 9
 The jury found against Diners on these contentions. We agree with Judge Ward that there was sufficient evidence to support the verdict. Marx & Co., Inc. v. Diners Club, Inc., 400 F.Supp. 581 (S.D.N.Y.1975). The crucial issue, sufficiently posed by objection below, is whether, notwithstanding the general discretion allowed to trial judges respecting expert testimony, see Sanchez v. Safeway Stores, Inc., 451 F.2d 998 (10th Cir. 1971); Casey v. Seas Shipping Co., 178 F.2d 360 (2d Cir. 1949), the admission of the testimony of a securities law expert, Stanley Friedman, was, in the circumstances, an error of law and highly prejudicial. His testimony construed the contract, as a matter of law, and includes his opinion that the defenses of Diners were unacceptable as a matter of law. In his denial of defendant's motion for a directed verdict at the close of the evidence, the judge indicated that the plaintiffs had made a prima facie case through Friedman.
 
 
 10
 We hold that the District Court erred in permitting Friedman, an expert witness called by plaintiffs, to give his opinion as to the legal obligations of the parties under the contract. Mr. Friedman, a lawyer and a witness not named in the pretrial order, was called as a rebuttal witness on the last day of a three-week trial.[9] Friedman was qualified as an expert in securities regulation, and therefore was competent to explain to the jury the step-by-step practices ordinarily followed by lawyers and corporations in shepherding a registration statement through the SEC. Indeed, Friedman had done so as an expert witness on previous occasions. In Republic Technology Fund, Inc. v. Lionel Corp., 483 F.2d 540, 552 (2d Cir. 1973), this Circuit reversed the dismissal of a breach of contract claim that the defendant had failed to cause a registration statement to become effective within a reasonable time. 483 F.2d at 552. The issue there was whether a delay of one year before the S-1 became effective was a result of an originally misleading interim statement accompanying the S-1, in which event, "the delay may well have been unreasonable." Id. Mr. Friedman gave expert testimony that six to eight weeks was all that should have been necessary to effectuate a registration statement because "much of the work going into it had already been done" in the preparation of a proxy solicitation filed by the surviving corporation in a merger. This testimony concerned the practices of lawyers and others engaged in the securities business.[10] Testimony concerning the ordinary practices of those engaged in the securities business is admissible under the same theory as testimony concerning the ordinary practices of physicians or concerning other trade customs: to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry. See VII Wigmore on Evidence § 1949, at 66 (3d ed. 1940).[11]
 
 
 11
 In the case at bar, however, witness Friedman's objectionable testimony did not concern only the customary practices of a trade or business. Rather, he gave his opinion as to the legal standards which he believed to be derived from the contract and which should have governed Diners' conduct. He testified not so much as to common practice as to what was necessary "to fulfill the covenant" (of the contract). For example, over the objection of defense counsel, he said that:
 
 
 12
 "I construe 'best efforts' in the context of a covenant to register shares as the assumption on the part of the person who gives the covenant an absolute, unconditional responsibility, to set to work promptly and diligently to do everything that would have to be done to make the registration statement effective. . . ." (emphasis added)
 
 
 13
 Counsel made timely objection "that's a legal conclusion." Similarly, the witness opined that "the best efforts obligations requires you to pursue the registration statement unless there is cause beyond your control."[12] This testimony did not concern practices in the securities business, on which Friedman was qualified as an expert, but were rather legal opinions as to the meaning of the contract terms at issue. It was testimony concerning matters outside his area of expertise. See Federal Rule of Evidence 702. Moreover, it would not have been possible to render this testimony admissible by qualifying Friedman as an "expert in contract law." It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge. As Professor Wigmore has observed, expert testimony on law is excluded because "the tribunal does not need the witness' judgment. . . . (T)he judge (or the jury as instructed by the judge) can determine equally well. . . ." The special legal knowledge of the judge makes the witness' testimony superfluous. VII Wigmore on Evidence § 1952, at 81. See 3 Corbin on Contracts § 554, p. 227 (1960). ("Construction (of a contract) is always a matter of law for the Court"). Accord, Loeb v. Hammond, 407 F.2d 779 (7th Cir. 1969) (testimony of attorney on legal significance of documents was properly excluded). "The question of interpretation of the contract is for the jury and the question of legal effect is for the judge. In neither case do we permit expert testimony." Id. at 781.[13]
 
 
 14
 Not only did Friedman construe the contract, but he also repeatedly gave his conclusions as to the legal significance of various facts adduced at trial. He testified on direct examination that, pursuant to its contractual obligation, Diners Club "should have" filed its registration on or about June 20, 1969, and not at the end of August, and therefore concluded that Diners Club did not use its best efforts promptly to file. He asserted that it would not be a legal excuse (1) that Diners' employees may have been occupied in other activities, or (2) that the parties to the contract were simultaneously attempting to renegotiate the contract, "Therefore, I don't see that it excuses performance" or (3) that plaintiffs had failed to advance one-half of the costs of the registration.[14] He also gave it as his legal opinion that the fact that the parties were exploring alternatives was not a legal waiver by the plaintiffs of the requirement that Diners go forward.
 
 
 15
 Friedman was also permitted to testify, over objection, that correspondence between the litigants relating to the payment of one-half the cost of registration by the plaintiffs, including a letter to plaintiff Marx dated July 15, was irrelevant "because the registration statement would have been filed by approximately June 20th and therefore this question comes up very much after the fact." Friedman himself conceded that his opinions were based in part on his "experience and use of the English language." His conclusion that Diners Club had no legal excuses for nonperformance was based merely on his examination of documents and correspondence, which were equally before the judge and jury. Thus Friedman's opinion testimony was superfluous. See VII Wigmore on Evidence, § 1918.[15] As Professor McCormick notes, such testimony "amounts to no more than an expression of the (witness') general belief as to how the case should be decided." McCormick on Evidence, § 12 at 26-27. The admission of such testimony would give the appearance that the court was shifting to witnesses the responsibility to decide the case. McCormick on Evidence § 12, at 27. It is for the jury to evaluate the facts in the light of the applicable rules of law, and it is therefore erroneous for a witness to state his opinion on the law of the forum. Loeb v. Hammond, supra.[16] To the prompt objections that segments of Friedman's testimony were legal conclusions, the trial judge responded by refusing to strike the testimony and by telling counsel he could cross-examine. But in such circumstances, compelling the opponent to cross-examine to repair the damage is to invite disaster, for much will turn on the obstinancy of the expert, and repetition before a jury, especially on cross-examination, is likely to impress the jury. The applicable law, not being foreign law, could, in no sense, be a question of fact to be decided by the jury.
 
 
 16
 The limits of expert testimony in securities cases should not be too difficult to draw. While the able trial judge below recognized that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact," Fed.R.Ev. 704, he failed, in our view, sufficiently to emphasize "otherwise admissible."[17] With the growth of intricate securities litigation over the past forty years, we must be especially careful not to allow trials before juries to become battles of paid advocates posing as experts on the respective sides concerning matters of domestic law. See La Chemise Lacoste v. Alligator Company, Inc., 59 F.R.D. 332, 333 (D.Del.1973).
 
 
 17
 One final aspect of Friedman's testimony was objectionable. The expert's dogmatic view that the registration statement should have become effective not more than 70 days after it was filed, derived not from an analysis of the facts involved in formulating this particular registration statement of this particular travel agency, but rather directly from an SEC Report statistic of the median time for such effectiveness, covering all sorts of companies in a variety of industries. The trial judge judicially noticed that the median figure was 70 days, but this hardly justified the categorical conclusions tendered to the jury by the witness as if that precise figure were irrefutable evidence on "reasonableness." Indeed, as we have seen, the witness boldly asserted that any questions relating to the period after the end of August 1969, when the registration "should have" become effective, were "irrelevant."
 
 
 18
 The issue for the jury was whether Diners' conduct was reasonable in the circumstances in which it found itself not what a median statistic showed. The statistic could have served as a possible starting point for the discussion of the particular issue involved, but it should not have been given to the jury as if it were akin to a statute of limitations without regard to the particular facts. In that sense, we would grant its relevance, however slight it might be, in evaluating it with other facts. See Fed.R.Ev. 401. In the frame within which it was used, however, the statistic, though relevant, became an item of prejudicial overweight. See Federal Rule of Evidence 403.[18]
 
 
 19
 There is no doubt that in assessing damages, the jury found that, pursuant to Friedman's testimony, the registration statement should have become effective on August 29, for it measured the damages by the market price of the Diners' stock on that day, $23.50 less the $15 price received by the Fugazys on the subsequent tender offer.[19]
 
 
 20
 The basis of expert capacity, according to Wigmore (§ 555), may "be summed up in the term 'experience.' " But experience is hardly a qualification for construing a document for its legal effect when there is a knowledgeable gentleman in a robe whose exclusive province it is to instruct the jury on the law. The danger is that the jury may think that the "expert" in the particular branch of the law knows more than the judge surely an inadmissible inference in our system of law.[20]
 
 
 21
 In the securities law field, as in taxation, there are areas in which the expert can testify. Of course, opinions on value are clearly within the province of the knowledgeable expert. See, e. g., Spitzer v. Stichman, 278 F.2d 402, 409 (2d Cir. 1960). Illustratively also, he may testify how the bid and asked price of an over-the-counter security gets into the "pink sheets," how price stabilization works, or how a stock exchange specialist operates. But these examples have their counterparts in non-admissibility. The expert, for example, may tell the jury whether he thinks the method of trading was normal, but not, in our view, whether it amounted to illegal manipulation under Section 9 of the Securities Exchange Act of 1934. He may explain the nature of an option contract, or of a convertible preferred stock, but we doubt that he should be allowed to testify that under an option agreement one party or the other has acted unlawfully, or that a corporation should be held liable because through a recapitalization it changed the conversion ratio and that this was a breach of contract. See United States v. Cohen, 518 F.2d 727, 737 (2d Cir. 1975).[21]
 
 
 22
 Recognizing that an expert may testify to an ultimate fact, and to the practices and usage of a trade, we think care must be taken lest, in the field of securities law, he be allowed to usurp the function of the judge. In our view, the practice of using experts in securities cases must not be permitted to expand to such a point, and hence we must reluctantly conclude that the leeway allowed Friedman was highly prejudicial to the appellant.
 
 II
 
 23
 Diners contends that it should have had a directed verdict because it had entered into an accord and satisfaction with the plaintiffs on August 27 providing that if the Fugazys signed and performed a written agreement acknowledging the prior Payment Condition, acknowledging their non-performance of the condition, and evidencing their undertaking to guarantee personally the obligation to pay one-half the expenses and if they delivered a proper indemnity agreement, Diners would proceed with the filing of the registration statement.
 
 
 24
 Diners raised the defense of accord only after verdict. It did not request its submission to the jury. If the issue had been presented in timely fashion, the existence of the accord would have been a question of fact for the jury. Judge Ward correctly rejected the belated argument.
 
 III
 
 25
 Defendants Diners and Diners/Fugazy Travel filed three counterclaims against plaintiffs. The first counterclaim, based on Rule 10b-5, alleged that defendants had been defrauded by the plaintiffs into purchasing the assets of Fugazy Travel through misrepresentations and omissions concerning the nature and worth of those assets. The second counterclaim alleged that the Fugazys breached their common-law fiduciary duties to Diners and Diners/Fugazy Travel, arising from their capacities as officers and directors, by engaging in various self-dealing practices, including retention of an interest in Travelco, Inc., a franchisee of Fugazy Travel. The third counterclaim alleged that the misrepresentations and omissions underlying the first counterclaim also constituted breaches of the Purchase Agreement which, inter alia included warranties of full disclosure.
 
 
 26
 Evidence was presented by each side, and Judge Ward submitted the counterclaims to the jury in the form of a separate special verdict. The jury answered in favor of the plaintiffs on the counterclaims. After the verdict, the defendants moved to set it aside and the court denied the motion, as it had previously done on a motion for a directed verdict. Diners does not complain of the charge, but bases its appeal on the ground that the court erred in denying Diners' motions for a directed verdict and for judgment, Rule 50(b), on the counterclaims. Diners also complains of the exclusion of certain evidence relevant to its counterclaims. We affirm the judgment on the counterclaims.
 
 
 27
 Defendants' argument is essentially that the jury's verdict was unsupported by the evidence. It was established at trial that the Fugazys contracted in the Purchase Agreement and in their employment contracts not to engage in the travel business or to retain an interest in such a business. At the closing, the Fugazys signed affidavits that they had divested themselves of any such interest. It later appeared that, with respect to Travelco, some relationship continued to exist, through a management service contract with Travelco, pursuant to which the Fugazys were officers and directors. This was disclosed prior to the closing.
 
 
 28
 There was evidence, however, that the Fugazys had entered into an indemnity agreement with one Irwin Fruchtman, the purchaser of their interest in Travelco. The indemnity agreement provided, inter alia, that when a certain bank loan of Travelco (which Fruchtman had guaranteed and for which he was to be indemnified) was paid, the Fugazys would have the option to acquire 60% of the shares of Travelco for $1.00. Whether this indemnity agreement was disclosed was the subject of some dispute. As Judge Ward said in his opinion denying the Rule 50(b) motion for judgment, "The jury chose to believe plaintiffs." We can add nothing to that gem of succinctness.
 
 
 29
 Judge Ward properly left it to the jury to determine whether the option provision of the indemnity agreement was an "interest" within the meaning of the contract. Defendants did not object to the charge, nor did they request any addition thereto. There was no evidence that plaintiffs had ever exercised their option.
 
 
 30
 Thus, there was sufficient evidence to support the verdict on all the counterclaims. Defendants also contend, however, that the District Court erred in excluding evidence relevant to its first and third counterclaims, based on alleged misrepresentations and omissions. There were three pieces of evidence said to have been wrongfully excluded, as follows: (1) the circumstances surrounding a prior unrelated lawsuit entitled "Fugazy Travel Bureau, against Tower Credit Company"; (2) a memorandum on the stationery of Fugazy Travel purportedly reflecting an offer to sell that company in 1966 to Pierbusseti, Inc. through one Piscatella for $250,000, plus the assumption of $350,000 in liabilities; (3) testimony by Piscatella to the effect that Mr. Fugazy was aware in 1966 of pitfalls in the franchising concept which was sold to Diners in 1967. Defendants urge that all three items were probative of the Fugazys' knowledge and belief at the time that they sold the assets in Fugazy Travel, Inc.
 
 
 31
 (1) With respect to the Tower Credit Company lawsuit, which took place five years before the Diners transaction, Judge Ward acted well within his discretion in refusing to admit the unsworn complaint filed in that litigation. Since it was unauthenticated hearsay involving a case that had been settled, and since the purpose for which Diners intended to use the unsworn complaint was avowedly to prove a prior fraud, the prejudicial effect of the unsworn complaint outweighed its probative value. Fed.R.Evid. 403.
 
 
 32
 (2) The unsigned memorandum was excluded on the basis of lack of authentication to bind these plaintiffs. A witness, Piscatella, did testify that he received it from Summerlin and that he subsequently had a meeting with Marx. We cannot say that the judge abused his discretion in excluding the unsigned memorandum, since the development of its background and consequent anticipated rebuttal might have tended to a confusion of issues requiring a minitrial in itself.
 
 
 33
 (3) Piscatella was permitted to testify to conversations with William Fugazy concerning the operations of his company. The judge stated that he would accept proof of admissions made, even in 1966, but that he would not accept the "self-serving positive statements" of the witness that he had personally evaluated the franchising concept and that, in his opinion, it was worthless. No further admissions were offered, and the judge's ruling was correct.
 
 IV
 
 34
 The District Court directed a verdict for defendants on plaintiffs' claim, under Rule 10b-5, that they were induced to sell Fugazy Travel Bureau in October 1967, on the basis of representations concerning the timing of the Continental takeover. The takeover unquestionably was effectuated in 1970; the claim is that it took place later than was allegedly represented to them. Judge Ward concluded that, as a matter of law, the defendants made no material misrepresentations prior to the closing date as to the specific date or time of the takeover; and that the plaintiffs did not rely on any representations regarding the timing of the takeover.
 
 
 35
 At trial, plaintiff Louis Fugazy testified that in October 1967 one officer of Diners Club told him that the takeover was "imminent." Plaintiff Marx testified that he was similarly told that "there would be a takeover in the foreseeable future." Plaintiff William Fugazy was told that Continental would acquire Diners "very shortly." On their cross-appeal plaintiffs contend that these were "specific representations" concerning the timing of the takeover, which was, in fact, not consummated for almost three years.
 
 
 36
 We agree with the District Court that plaintiffs did not make out a prima facie case under Rule 10b-5. As Judge Ward observed, there was no evidence that defendants indicated any specific time or method by which the takeover would occur. The general statements which were made (viewing the evidence most favorably to plaintiffs) did not constitute material misrepresentations of fact.
 
 
 37
 We need not hold that plaintiffs did not rely on these statements, although it is certainly difficult to believe that plaintiffs, sophisticated investment bankers and businessmen, would have governed their conduct in reliance on such imprecise representations. Similarly, we need not hold that these alleged representations were immaterial as a matter of law, although a reasonable man would certainly be hesitant to attach great importance to such indefinite predictions of the future. See Radiation Dynamics, Inc. v. Goldmuntz, 464 F.2d 876 (2d Cir. 1972), citing SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir.), cert. denied sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968); List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir.), cert. denied sub nom. List v. Lerner, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). For the defendants never represented as a fact that a takeover would occur within a certain period. They merely gave their general predictions as to future events. Thus, plaintiff Summerlin testified that he had been told that there was a probability of a takeover. Plaintiff Marx recognized that there was only a "possibility or probability" of a takeover, and he personally participated in attempts to try to effectuate the transaction. Plaintiff William Fugazy was told that it "looked like" Continental was going to acquire Diners.[22] Given the nature of these statements, we think the District Court properly noted the absence of any representations of specific timing. The general nature of the predictions precludes them from being representations of fact.
 
 
 38
 To establish such a misrepresentation, plaintiffs had the burden of showing that, in making these predictions as to the takeover, defendants acted with scienter, that is, an intent to deceive, manipulate or defraud. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375 at 1381, 47 L.Ed.2d 668 & n. 2 (1976). They did not meet this burden. There was, on the contrary, evidence that they exerted substantial efforts to bring these predictions to fruition. And, of course, it is undisputed that the takeover was effected in 1970.
 
 
 39
 Affirmed in part; reversed in part and remanded.
 
 
 
 *
 Judge Hays concurred in the disposition of the appeal but has not had an opportunity to review the opinion because of illness
 
 
 [1]
 The sellers included plaintiffs Marx and Co., Inc., Otto Marx, Jr., John V. Summerlin, Jr., William D. Fugazy and Louis V. Fugazy, collectively referred to as "the Fugazys."
 
 
 [2]
 Plaintiffs initially maintained that defendants also violated Rule 10b-5 by fraudulently inducing them to agree to an amendment of their employment contracts. The jury returned a verdict for the defendants on this claim and the plaintiffs do not appeal
 
 
 [3]
 While there was no formal amendment of the complaint at trial, we think that the judge acted within his discretion in submitting the breach of contract issue to the jury, since the alternative claim was no surprise from the time of the pretrial order and the plaintiffs' opening to the jury, as well as from the briefs submitted. See Fed.R.Civ.P. 15(b). Moreover, the special verdict form which set forth separately plaintiffs' breach of contract claim was approved by counsel for the defendant
 Diners maintains that the verdict was contrary to the weight of the evidence; that it was entitled to a directed verdict because its performance was excused by the Fugazys' failure to perform certain conditions precedent, viz., to tender funds sufficient to reimburse Diners for one-half of all registration expenses and to deliver an indemnity agreement, see note 4, infra, that the District Court erred in refusing to apply the defense of accord and satisfaction to bar the claim; and that the testimony of a key witness for the plaintiff, a lawyer named Stanley Friedman, went beyond the proper scope of expert testimony and was prejudicial. Plaintiffs urge, by contrast, that the evidence shows that Diners neither filed a registration statement promptly nor used its best efforts to cause it to become effective and that plaintiffs' performance of its obligations under the contract was hindered by Diners Club; that the defense of accord was never tried and, therefore, properly rejected; and that the testimony of plaintiffs' expert witness was properly admitted.
 
 
 [4]
 Paragraph 10.2(b) provides:
 "If Diners shall not have filed any such registration statement subsequent to January 1, 1968 and before January 1, 1969, then, provided there are outstanding more than 25,000 shares bearing legend provided for in Section 10.1(c) hereof, the registered holders thereof (but not less than all of them) may at any time after January 1, 1969, notify Diners that they desire that Diners file such a registration statement, but only with respect to all such shares then owned by all such holders. Unless Diners shall have received an opinion from its counsel that registration is not required, or if Diners and all such registered holders, together proceeding expeditiously and in good faith after such notice, cannot obtain from the Securities and Exchange Commission a 'no-action' letter with respect to the sale of such shares, then Diners shall promptly file a registration statement and use its best efforts to cause such registration statement to become effective. Diners may include in such registration statement such other of its securities as it may desire. Anything to the contrary notwithstanding, Diners need not file any such registration statement until it may lawfully use its regularly prepared fiscal year end financial statements, as a part of such registration statement. The notifying holders shall pay Diners in advance an amount sufficient to reimburse Diners for one-half of all registration fees, printing costs, auditing fees (but only in excess of normal fees paid by Diners for its fiscal year end audit, legal fees and all other incidental out-of-pocket expenses incurred in connection with such registration statement)."
 
 
 [5]
 Before the registration statement was withdrawn, defendant Continental Corporation made a public tender offer for Diners stock. The Fugazys sold most of their shares to Continental at $15 a share, which was less than the market price at the time that the registration statement was filed, though more than the market price at the time of tender
 
 
 [6]
 There was some evidence that Diners' officials considered Marx' request for registration a move to get Continental to buy him out and that one officer's reaction was "to do nothing."
 
 
 [7]
 In April, 1969, plaintiffs indicated that they were "prepared and hereby offer . . . to furnish the indemnity agreement. . . ." No formal agreement actually was signed and tendered until August, however
 
 
 [8]
 For example, on May 19, 1969, Marx wrote to Diners setting forth an alternative proposal so that the Fugazys' Diners shares "would not have to be registered at this time" and solicited alternative proposals in lieu of registration
 
 
 [9]
 Our holding with regard to the inadmissibility of the substance of Friedman's testimony makes it unnecessary to consider defendant's contentions that he was a surprise witness and an improper rebuttal witness. We note, however, that the prejudicial effect of Friedman's improperly admitted testimony may well have been heightened by the fact that he testified as the last witness on the last day of a three week trial
 
 
 [10]
 In the Republic Technology case Mr. Friedman gave testimony concerning the practices of people engaged in this business: that it would be the practice of a prudent lawyer to research blue sky laws prior to the issuance of securities, that it would be unprofitable business practice to cause a registration statement to become effective prior to an imminent merger, and that the ordinary practice of the SEC would be to refer the registration statement to the same SEC staff that had handled the proxy solicitations of the company. Republic Technology, supra, Appendix on Appeal 292, 293, 297, 303-04
 
 
 [11]
 Of course, expert testimony concerning the practices of a particular trade or business is not admissible if, as a matter of substantive law, only the jury's common understanding and not the customary practices or usages are relevant. Cf. Royal Loan Co. v. United States, 154 F.2d 556 (8th Cir. 1946) (testimony of securities dealers superfluous in action to recover documentary stamp tax levied on instruments "known generally as corporate securities.")
 
 
 [12]
 Apparently Friedman gave similar testimony concerning the content of the "best efforts" obligation in Republic Technology Fund, Inc. v. Lionel Corp., supra, Appendix on Appeal at 279, 283, 591-93, a case tried to the court without a jury. The propriety of this testimony was not before the court on that appeal, however, because the district court had dismissed the complaint notwithstanding this testimony. Although defense counsel had objected to this testimony at trial, they did not appeal its admission since they had won below. In reversing the trial judge, moreover, this court did not rely on the improper testimony as the ground for its decision to remand
 
 
 [13]
 Kirkland v. Nisbet, 3 Macq.Sc.App. C 766 (1859), "Evidence as to mercantile usage may be received; . . . but you cannot ask a witness what is the meaning of a written document."
 
 
 [14]
 The District Court overruled defense objections to this testimony, noting that defense counsel would have "a chance to cross-examine" Friedman. On this cross-examination Friedman amplified his view that the plaintiffs' obligation to advance costs was not a condition precedent, commenting that "Mr. Marx behaved in a reasonable way and . . . it was Diners that was behaving unreasonably. . . ." He concluded that the contractual provision for costs was "impossible of fulfillment." On cross-examination he also asserted that Diners Club was not legally justified in waiting for plaintiffs to furnish the indemnity agreement required under the contract
 
 
 [15]
 Cf. Hawkins v. Chandler, 88 Idaho 20, 396 P.2d 123 (1969) (highway patrolman improperly testified as to reasonableness of conduct of driver of disabled wrecker); Grismore v. Consolidated Products Co., 232 Iowa 328, 5 N.W.2d 646 (1942) (abolition of "ultimate issue" rule does not mean witnesses may express opinions as to whether conduct measures up to the requisite legal standard)
 
 
 [16]
 Cf. Helms v. Sinclair Refining Co., 170 F.2d 289 (5th Cir. 1948) (oil distributor's legal conclusion that he was under a contractual duty to make a shipment); Briney v. Tri-State Mut. Green Dealers Fire Ins. Co., 254 Iowa 673, 117 N.W.2d 889 (1962) (testimony by claims agent as to the legal effect of the relationship between independent adjusters and the insurance company was properly excluded)
 
 
 [17]
 "The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day." Notes of Advisory Committee on Proposed Rule 704, Fed.R.Evid
 
 
 [18]
 In the words of Judge Friendly, "the leap required to derive any rational conclusion from the expert's data was too great to allow a jury to take." Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906, 912 (2d Cir. 1962)
 
 
 [19]
 Friedman misconceived the meaning of "median." The median figure simply means that half of the registration statement took less than 70 days to become effective, and that half took more than 70 days. The jury was never told that fully half the registration statements actually took more than 70 days. Nor was any indication given to the jury of the longest period for becoming effective, nor were any reasons given for the disparity in time between the effective date of one registration statement against another. The statistic, while admissible by a stretching of relevance, should not have been accepted as undisputed fact on which to build an expert opinion without further explanation of its meaning
 
 
 [20]
 Cf. Huff v. United States, 273 F.2d 56 (5th Cir. 1959) (testimony by government customs inspector concerning "commercial" nature of imported goods); Warren Petroleum Co. v. Thomasson, 268 F.2d 5 (5th Cir. 1959) (testimony by police officer as to liability for auto accident which he witnessed). We cannot ignore the tendency of juries on occasion "to decide simply according to the preponderance of numbers and of influential names. . . ." VII Wigmore on Evidence § 1918, at 11; see Duncan v. Mack, 59 Ariz. 36, 122 P.2d 215 (1942)
 
 
 [21]
 In Cohen, we affirmed Judge Ward in permitting the Chief of the Branch of Small Issues to give her expert opinion of the reach of the concepts of "underwriter" and "materiality."
 
 
 [22]
 Plaintiffs put great emphasis on an alleged response of Victor Herd, the head of Continental Insurance to an inquiry about his takeover plans: "Well, you don't court a girl unless you are going to marry her."
 But this evidence has the same infirmity as the rest of plaintiffs' case: the only fact that was represented was Continental's general intent to effectuate the acquisition.