**UNITED STATES of America,**

v.

**Edward S. BUCHANAN, Defendant.**

**No. 95CR–10188–NG.**

United States District Court,
D. Massachusetts.

March 31, 1997.

534

Francis J. DiMento, DiMento & Sullivan, Boston, MA, for Defendant.

Anita S. Lichtblau, New England Bank Fraud Task Force, Boston, MA, William T. Clabault, Trial Attorney, New England Bank Fraud Task Force, Department of Justice, Boston, MA, for Plaintiff.

## ORDER REGARDING EXPERT TESTIMONY

GERTNER, District Judge.

### I. INTRODUCTION

The Defendant, Edward S. Buchanan ("Buchanan"), has been indicted on a number of counts related to his role as Bank President of MassBank, a federally insured institution. It is alleged that Buchanan abused the trust of his office, concealed certain conduct from bank directors and flaunted federal banking laws, to the detriment of the Bank and for his own benefit.

On March 17, 1997, seventeen days before the March 31, 1997 start of trial, the Government gave notice to the Defendant, pursuant to Fed.R.Crim.P. 16(a)(1)(E), that it intended to utilize a banking expert, Timothy J. Hansberry, the President and Chief Executive Office of Affiliated Community Bancorp, Inc., a bank holding company located in Waltham, Massachusetts.

Shortly thereafter, Defendant moved to exclude the expert's testimony on a number of grounds, expressed to the Court in writing and orally during a status conference. First, the Defendant opposed the expert as a matter of evidence law, that the testimony would not assist the jury in deciding the case. Second, the Defendant opposed the expert on fairness grounds—that the Government announced its intention two weeks before trial, that the Government had not produced an adequate pretrial report of the expert under Rule 16, and further that the Defendant would now have to expend the time and resources to obtain its own expert, something that would be difficult to do at the eleventh hour.

On March 27, 1997, I granted the Defendant's motion to exclude the expert testimony on substantive evidentiary grounds, as well as on grounds of notice and fundamental fairness. The Government moved to reconsider, which motion I denied on March 28, 1997.

### II. EVIDENTIARY ISSUES

Rule 702, Fed.R.Evid. provides for the admission of "specialized knowledge" through expert testimony. The standard calls for the

court to determine relevance—also described as the "degree of fit" [1]—as well as whether the evidence will, in the language of the rule, "assist the trier of fact to understand the evidence or to determine a fact or issue."

At the same time, mindful of the unique power of an expert to lend extraordinary credence to his or her testimony, I am obliged to weigh the proposed testimony in the light of Rule 403, which provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

In effect, Rule 403 requires the Court to determine whether the jurors will give the testimony more weight than they should, or use it for improper purposes,[2] and whether the likelihood of such prejudice outweighs the evidence's probative value.

This enterprise of weighing probative value against prejudicial impact melds some procedural concerns as well, concerns more directly addressed in part II, below—whether the adversary system will be effective in bringing all issues before the jury, whether the Defendant has been provided enough evidence to effectively cross examine, whether the jury will understand that cross examination.

I find that in this instance the prejudicial value of the testimony far outweighs its probative value.

## A. Nature of the Charges

Defendant Edward Buchanan was the president and chief executive officer of Mass-Bank.[3] He had held this position since 1971, and his duties included serving as chairman of the Bank's Board of Directors.[4] Buchanan also owned over 99% of the Bank stock and he owned and controlled the 245 Trust, a realty trust which in turn owned the building in which the MassBank headquarters were located.

Beginning no later than May 28, 1986, the Board was required to approve all disbursements of Bank funds and remuneration to Buchanan and his related interests. Apparently this approval process involved the Board's consideration of the purpose and ultimate beneficiary of the disbursements and any benefit to MassBank from the expenditure. In addition, Buchanan was required to provide the Board with documentation with respect to his business expenses exceeding a certain amount.

According to the Indictment, Buchanan did not comply with these requirements. To the contrary, it is alleged that beginning in or about June of 1986 and continuing through in or about May of 1991, Buchanan conspired to misapply Bank funds in two related schemes. First, the Indictment charges that Buchanan intentionally misdirected Bank funds to pay for certain personal and family expenses, including purchasing cars,[5] investing in a yacht,[6] paying full-time salaries to family

1. Judge Becker in *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir.1985) characterized this consideration as one of fit.

2. "Unfair prejudice" described by Rule 403 does not refer to the fact that a particular piece of evidence will have an adverse effect on a party's case. Most evidence offered by an opponent should have this impact. Rather " 'unfair prejudice' within this context means an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." Notes of the Advisory Committee on Proposed Federal Rules of Evidence, 28 U.S.C. Rule 403 at 102. *See United States v. Grassi*, 602 F.2d 1192, 1197 (5th Cir.1979), vacated and remanded on other grounds, 448 U.S. 902, 100 S.Ct. 3041, 65 L.Ed.2d 1131 (1980).

3. MassBank was a banking institution chartered in the Commonwealth of Massachusetts, with headquarters in Brockton, Massachusetts. Deposits at the Bank were insured by the Federal Deposit Insurance Corporation (FDIC).

4. The Board of Directors includes a Bank vice president, one or two other officers of the Bank and three members who were not Bank employees. The Board met on a monthly basis.

5. The Indictment alleges that MassBank, in whole or in part, paid for, insured, and in some instances paid for the repairs of, luxury automobiles that were for the private use of Buchanan and his two daughters.

6. According to the Indictment, until May 18, 1989, the First Massachusetts Leasing Corpora-

members and crew members of the yacht who did not perform any services or inconsequential services for the Bank.[7] Second, it is alleged that Buchanan illegally pocketed $50,000 of MassBank funds, received in settlement from a 1992 legal malpractice lawsuit brought by MassBank, Buchanan and former MassBank Vice President Jerome Harriman against the Bank's former law firm. According to the Indictment, without the knowledge or consent of MassBank's Board of Directors, Buchanan took the $50,000 and structured various deposits and transactions to avoid reporting requirements.

As a result, Buchanan is charged with conspiracy (18 U.S.C. 371); misapplication of bank funds (18 U.S.C. § 656); currency structuring (31 U.S.C. §§ 5324(a)(3) and 5322(b)); aiding and abetting (18 U.S.C. § 2), and causing an offense (18 U.S.C. § 2).

### B. Nature of the Expert Testimony

The Government describes Mr. Hansberry's testimony as follows: Based on his thirty two years of experience in the banking industry, spanning all sizes of financial institutions, he will describe the special nature of the banking industry, and the generally prevailing processes by which executive perquisites, compensation and expenses are determined and approved in the regulated banking industry. He will be asked to apply this experience to the question of whether the acts that the Defendant allegedly took were "consistent with the generally accepted standards for conduct in the banking industry."

The acts in question—presumably proved by documents, employees and officials of the Bank—consist of the following:

- Payment of $36,275.76 in salary and benefits to Jacqueline Buchanan (Mr. Buchanan's younger daughter); payment of $12,687.59 in salary and benefits to Mary Buchanan (Mr. Buchanan's elder daughter); without the knowledge and consent of the Board of Directors, and without the Bank receiving any discernible benefit.

- Expenditure of $153,375 to purchase a 1987 Rolls Royce automobile and an additional $11,096.45 to insure, transport and repair the car; without the knowledge and consent of the Board of Directors, and without the Bank receiving any discernible benefit.

- The purchase of a 1987 Mercedes Benz 190E for Jacqueline Buchanan, and a 1988 Jeep Cherokee for Linda Buchanan; without Board of Director's approval and without the Bank receiving any discernible benefit.

- Payment of $184,212.60 in salaries to crew members of the Yacht Emerald Isle; without the knowledge or consent of the Board of Directors; without any documentation as to which percentage of the yacht's use was for personal use and which percentage for business use (to entertain Bank customers).

The Government does not maintain that the Hansberry testimony is important to "assist the trier of fact" as a matter of course. Presumably, a jury could well understand the Government's arguments concerning the significance of the Defendants' acts in the light of the statutes and regulations governing a federally insured bank.

Rather, the Government suggests that the Hansberry testimony is suddenly important in the light of what it understands the defense to be. According to the Government,

tion (FMLC) was a wholly-owned subsidiary of First Florida Management Corporation, a corporation owned and controlled by Buchanan. FMLC owned and managed various assets, including a luxury yacht and luxury cars, all used by Buchanan, his family members and by some MassBank employees. On May 18, 1989, MassBank purchased fifty percent of FMLC's stock. On March 13, 1990, MassBank sold its fifty percent share of FMLC to the 245 Trust. Allegedly, Buchanan directed MassBank employees to pay full-time salaries and benefits to the yacht's crew members.

The yacht was kept at Buchanan's home in Florida about half the year and was kept in Falmouth, Massachusetts for the remaining six months. Allegedly, Buchanan used the yacht primarily for his own benefit and that of his family and friends, not for MassBank business.

7. According to the Indictment, the Defendant's two daughters received salaries and employee benefits from MassBank for services they did not perform. In addition, his daughters had use of automobiles paid for in part and insured by, MassBank.

the defense will claim that as sole owner of the Massachusetts Bank and Trust Company, Mr. Buchanan was free to do whatever he wanted with the Bank's funds so long as the Bank maintained the minimal capital required by federal and state regulators. In addition, Mr. Buchanan will claim that the FDIC regulators unfairly singled him out for undue regulatory scrutiny and harassment.

That the Hansberry testimony is relevant and could assist the trier of fact in connection with the misapplication of Bank funds charge is clear. Indeed, as I describe below, it is so relevant and so helpful that it directly treads on the ultimate issues that the jury is obliged to decide. As a result, the fundamental issue is whether the probativeness of the testimony outweighs its clear prejudice.

 In evaluating probative value I am obliged to consider first "how strong a tendency" the proffered evidence has to prove the issue of consequence in the litigation, *United States v. Beechum*, 582 F.2d 898, 914–915 (5th Cir.1978) (en banc), and second, the proponent's need for the evidence, *United States v. Spletzer*, 535 F.2d 950, 956 (5th Cir.1976). Again, on the first point, the evidence has a very strong—perhaps too strong—tendency to prove the impropriety of the Defendant's conduct, coming very close to announcing that he is guilty of the offense charged. And, on the second point, it is abundantly clear that the Government has other ways to prove the point. It has always been clear that the Government will offer the testimony of Bank officials, including the Board of Directors, and regulators of the Bank. It can offer statutes and FDIC regulations to the jury on the question of the regulatory environment in which a federally insured bank was obliged to operate.

In short, expert testimony is simply not necessary. Indeed, for most of the year and four months since the second superseding indictment in November of 1995, the Government apparently did not believe it needed an expert on this subject; Mr. Hanberry is obviously an afterthought.

### C. Nature of the Prejudice

As part of the misapplication of bank funds charge, the Government will be obliged to show that the Defendant willfully misapplied moneys and funds of or intrusted to the Bank, and did so with the intent to injure or defraud the Bank. What is appropriate application of bank funds and what is misapplication depends upon the standards to be applied to the Defendant's conduct. Plainly those standards derive from the statutes, from the regulations, from common sense.

Mr. Hansberry's testimony—that Mr. Buchanan's conduct was not consistent with generally accepted standards of conduct of the industry—essentially announces that there has been a misapplication. Moreover, while his point may well be that Buchanan violated standards akin to the standards in a civil action, and while the Court will instruct the jury as to the difference between civil and criminal causes of action, there is a substantial risk that these distinctions will pass by the jury.

 To the extent that Mr. Hansberry's testimony recounts issues of law—the standards of conduct that plainly derive directly from the statutes and regulations—it invades the judge's function. *See Panter v. Marshall Field & Co.*, 646 F.2d 271, 293 n. 6 (7th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981) (affirming trial court's exclusion of plaintiffs' proffered expert testimony on the ordinary standards against which the actions of boards of directors and investment bankers would be measured because such evidence would impinge on the function of the trial court); *FDIC v. Greenwood*, 719 F.Supp. 749, 751 (C.D.Ill.1989) (allowing expert testimony so long as it does not usurp court's function). To the extent that it recounts issues of fact—whether Mr. Buchanan in fact misapplied Bank funds—it invades the jury's function: "Mere qualification as an expert is not license to invade the jury's function by telling the jury what result to reach, ... nor is it appropriate for an expert to supplant the judge's function to instruct the jury on the law." *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F.Supp. 1314, 1372 (S.D.N.Y.1982); *see also Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509–510 (2d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977)

(finding error where expert was permitted to construe a contract, and give conclusions as to the legal significance of various facts adduced at trial).[8]

Finally, this prejudice is exacerbated by the lateness of the hour in which the Government raised this testimony, an issue to which I now turn.

## III. *LATENESS OF NOTICE*

■ The issues about which Mr. Hansberry is being asked to testify were known to the Government nearly two years ago. On June 20, 1995, the Government first brought the indictment alleging misapplication of bank funds.[9] Certain charges, having to do with a real estate partnership, were severed from the bank charges. (*See* Memorandum and Decision Re: Defendant's Motion for Separate Trials, dated June 4, 1996).

Trial was originally set for December 2, 1996 but postponed due to the Court's schedule. At a pretrial conference held November 11, 1996, trial was set for March 17, 1997 and then, on the Government's motion, postponed until March 31, 1997. Under the Magistrate Judge's pretrial order, all motions were to have been filed by the summer of 1995; a final status report was issued by the Magistrate Judge in September of 1995.

On the date that the original trial was scheduled to begin, March 17, 1997, the Government filed a notice of its intent to call Mr. Hansberry as an expert witness. The Defendant objected, and filed a motion in limine. Defense counsel represented that the request was at the eleventh hour, that it would obligate him to find his own expert, and that there was insufficient time to do so.[10] Defense counsel indicated that, up until the moment that the Government gave notice of its expert, he believed that the Government would attempt to show misapplication by demonstrating through the statutes, and regulations the norms of conduct governing a federally insured institution. Defense counsel also questioned the adequacy of the report it had been given under Rule 16. Under the circumstances, I have serious doubts that Defendant would be prepared to appropriately cross examine Government's expert for the March 31, 1997 trial.

The Government has offered no explanation for the delay in identifying its expert, or even giving notice that it intended to use an expert at all. Defense counsel has made no secret of its defense in status conferences up until now, and in argument before the Court.

The Government cites to *United States v. Afrifa*, 91 F.3d 134 (4th Cir.1996) (unpublished opinion) for the proposition that there is no deadline for a Rule 16 submission. It would have this Court adopt the outcome in Afrifa, in which the court allowed the government to call a handwriting expert at trial, when it had given the Defendant notice concerning that expert less than one week before trial.

The citation to *Afrifa* is misleading, to say the least. The trial in which the handwriting testimony was admitted followed a mistrial. During the mistrial it was clear that the identity of certain handwriting was to be an issue at the retrial. In between trial I and

---

8. While Rule 704, Fed.R.Evid. provides that testimony "in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact," the key question is whether such testimony was "otherwise admissible." This testimony is not otherwise admissible; it invades the jury's job to decide the question of guilt.

9. That Indictment was superseded by a second, brought November 29, 1995 adding counts relating to the Government's claims that Buchanan misapplied $50,000 in proceeds from the June 1992 settlement of a legal malpractice lawsuit brought by the Bank, Buchanan, and former Bank Vice President Jerome Harriman, against a law firm which formerly represented the Bank. Mr. Hansberry's testimony apparently does not address the issues raised by these charges.

10. At the pretrial conference, I indicated that were I to find the evidence admissible, I would give defense counsel additional time to find an expert or otherwise prepare for Mr. Hansberry's testimony. Apparently based on his assumption that I would permit the admission of Mr. Hansberry's testimony and that the trial was likely to be continued in any event, Mr. DiMento, representing Mr. Buchanan, moved for a continuance from the March 31, 1997 date because of problems with a certain witness. When I apprised all counsel of my decision with respect to the expert witness, Mr. DiMento withdrew his motion.

trial II, the defendant was obliged to provide the government with handwriting exemplars. He had, the court concluded, ample notice of the possibility of a handwriting expert.

Not so here. In this over two year old prosecution, with multiple trial dates and conferences, the Government waited until seventeen days before trial to provide notice of this expert.

Accordingly, Mr. Hanberry's testimony is excluded.

SO ORDERED.